HON. ZAIDA HERNÁNDEZ TORRES en su capacidad de REPRESEN-
TANTE DE LA CÁMARA, apelada, *v.* HON. RAFAEL HERNÁNDEZ
COLÓN, HON. MIGUEL HERNÁNDEZ AGOSTO, HON. JOSÉ R.
JARABO y HON. NYDIA I. VELÁZQUEZ, todos en su carácter
oficial, apelantes.

*Número:* AC-90-707          *Resuelto:* 20 de febrero de 1991

*Lino J. Padilla* e *Ilsa Y. Figueroa Arús,* abogados de los apelantes; *Manuel D. Herrero García* y *Carlos Santiago Tavárez,* abogados de la apelada.

EL JUEZ PRESIDENTE SEÑOR PONS NÚÑEZ emitió la opinión del Tribunal.

El pasado 9 de enero de 1991 el Hon. Robert Abrams, Secretario de Justicia (*Attorney General*) del estado de Nueva York de Estados Unidos de América, solicitó permiso para comparecer en el presente caso como *amicus curiae.* (1) También solicitó que se le permitiera presentar su comparecencia escrita en el idioma inglés.

Reclama el Secretario Abrams que por razón de su cargo está facultado para comparecer en procedimientos legales para informar sobre la política pública del estado de Nueva York y que en tal condición representa al estado de Nueva York. Afirma que su interés en este caso parte del hecho de que el tribunal de instancia concluyó, en la sentencia que emitiera en este caso, que actividades desarrolladas por el Departamento de Asuntos de la Comunidad Puertorriqueña del Estado Libre Asociado de Puerto Rico violan la política pública del estado de Nueva York e invaden su soberanía. Interesa el Secretario Abrams exponer ante nos la posición del estado de Nueva York a los efectos de que no existe tal política pública ni invasión de soberanía. La apelada se ha opuesto a que se permita la comparecencia del Secretario Abrams como *amicus curiae* y también se opone a que se le permita presentar la misma escrita en el idioma inglés.

---

(1) Ningún otro estado ha hecho igual o semejante solicitud.

# I

■ El Reglamento de este Tribunal dispone, en su Regla 43 (4 L.P.R.A. Ap. I-A), que el Tribunal podrá autorizar la comparecencia como *amicus curiae* de cualquier parte realmente interesada. La jurisprudencia de este Tribunal ha definido las características de la figura del *amicus curiae* de la manera siguiente: (a) su comparecencia no es de derecho, sino que está sujeta a la sana discreción del Tribunal; (b) se justifica su participación en aquellos casos que estén revestidos de interés público; (c) su comparecencia debe responder principalmente a las necesidades del Tribunal de estar informado más que al mismo interés del *amicus curiae*, y (d) el *amicus curiae*, no puede convertirse en una parte del litigio. Véanse: *Pueblo ex rel. L.V.C.*, 110 D.P.R. 114 (1980); *Pueblo v. González Malavé*, 116 D.P.R. 578 (1985).

■ El caso ante nos está revestido de interés público, pues en el mismo el tribunal de instancia ha decretado la inconstitucionalidad de la Ley Orgánica en virtud de la cual se organizó un Departamento Ejecutivo del Gobierno del Estado Libre Asociado de Puerto Rico, a saber, el Departamento de Asuntos de la Comunidad Puertorriqueña en Estados Unidos. No creemos que pueda argumentarse razonablemente que no es éste un caso revestido de interés público.

■ Tal como señala el señor Secretario de Justicia del estado de Nueva York, en este caso una de las razones de decidir del tribunal de instancia es que la ley que crea el Departamento de Asuntos de la Comunidad Puertorriqueña en Estados Unidos, en su aplicación, contraviene la política pública e invade la soberanía del estado de Nueva York. No se desprende claramente de la sentencia emitida por el tribunal de instancia cómo determinó éste cuál es la política pública del estado de Nueva York en estos asuntos ni cómo la referida ley menoscaba la soberanía política de dicho estado. Es, pues, importante para este Tribunal obtener la mayor información posible sobre esas cuestiones. Y ¿quién mejor

que el propio estado de Nueva York para informarnos adecuadamente sobre ellas? Es claro, además, el interés que debe tener el estado de Nueva York en una determinación de que se conculca su política pública y su soberanía. Informarnos sobre tales asuntos es de su legítimo y sustancial interés, y no convierte al estado de Nueva York en una parte de este litigio.

Procede, pues, que mediante un sano ejercicio de nuestra discreción autoricemos al estado de Nueva York a comparecer como *amicus curiae* en este caso a los únicos fines de ilustrarnos en relación con los asuntos antes mencionados. Con ese propósito también procede autorizar a su Secretario de Justicia (*Attorney General*) a comparecer y a presentar un alegato ante este Tribunal como *amicus curiae*.

## II

Réstanos dictaminar sobre la solicitud de que se le permita al estado de Nueva York presentar su comparecencia en el idioma inglés.

En 1965 este Tribunal —enfrentándose al problema de si un abogado admitido a ejercer en Puerto Rico, quien no domina suficientemente nuestro idioma, tiene derecho a exigir que los procedimientos judiciales se conduzcan en el idioma inglés— este Tribunal, por voz de su entonces Juez Presidente Señor Negrón Fernández, dictaminó que:

> Siendo el español el idioma de los puertorriqueños, los procedimientos judiciales en nuestros tribunales deben seguirse en español, pero los jueces tomarán aquellas medidas que resulten necesarias para que, en protección de los derechos de cualquier acusado que no conozca suficientemente nuestro idioma, se mantenga a éste —y desde luego a su abogado por ser ello parte de su derecho a una defensa efectiva— informado, por medio de traductores o de otro modo eficaz, de todo lo que transcurra en el proceso, y para que así lo revele el récord. *Pueblo v. Tribunal Superior*, 92 D.P.R. 596, 606 (1965).

Por otro lado, la Regla 8.5 de Procedimiento Civil vigente, 32 L.P.R.A. Ap. III, dispone que:

Las alegaciones, solicitudes y mociones deberán formularse en español. Aquellos escritos que deba suscribir una parte u otra persona que no conozca el idioma español, podrán formularse en el idioma vernáculo de dicha parte o persona, siempre que se acompañen de las copias necesarias en español.

■ El reglamento de este Tribunal guarda silencio sobre el particular.

■ Debemos señalar que la petición ante nos no procede de un abogado admitido a ejercer en Puerto Rico ni es una solicitud de que los procedimientos en el caso se conduzcan en el idioma inglés como se trataba en *Pueblo v. Tribunal Superior*, supra. Se trata aquí de una solicitud para que se permita una sola comparecencia a un estado representado por su Secretario de Justicia.(2) Resulta obvio para nosotros que una comparecencia en inglés por un *amicus curiae* no tiene el efecto de convertir al idioma inglés los procedimientos a seguir en este caso. Ello no obstante, la solución al problema planteado nos la ofrece la Regla 8.5 de Procedimiento Civil antes aludida, la cual permite que las personas que no conozcan el idioma español *puedan formular su escrito en su idioma vernáculo*, siempre que acompañen las copias necesarias de los mismos en español.

### III

■ No existe prueba en el legajo de este caso de que el Estado Libre Asociado de Puerto Rico, por conducto de sus poderes constituidos, tenga designios, que podrían describirse como extraterritoriales, de atentar contra la política pública

---

(2) Dicho funcionario no ha planteado que él o sus ayudantes desconozcan el idioma español al grado que ese desconocimiento no les permita leerlo y entenderlo. Sólo solicitan que se les permita presentar su escrito en el idioma inglés. Esta petición es congruente con la experiencia cotidiana de que existen muchas personas en todos los niveles que tienen conocimientos suficientes de un idioma para leerlo y entenderlo, pero que no pueden escribirlo correctamente.

No resulta aceptable, como alternativa, la traducción al idioma inglés de sólo algunas partes del expediente. Si se ha de traducir para un cabal entendimiento no debe hacerse selectivamente, sino en su totalidad. Si así lo hiciéramos, estaríamos innecesariamente convirtiendo al idioma inglés los procedimientos en este caso.

individual de los respectivos estados y la nacional de Estados Unidos de América y menoscabar la soberanía de todos ellos. Entendemos que, sin necesidad de que este Tribunal se convierta en su celoso guardián, tanto Estados Unidos de América como cada uno de los estados que componen la Unión cuentan con medios suficientes para hacer valer su política pública y proteger su soberanía contra cualquier atentado en su contra con que les amenacen actividades extraterritoriales del Estado Libre Asociado. Por eso nos parece superflua la magna convocatoria "al menos" a seis estados y al Gobierno federal que el voto disidente del Juez Asociado Señor Negrón García acarrea.

## IV

En la situación de este caso en que se trata de una sola comparecencia por parte de un estado en donde el idioma vernáculo es el inglés y cuya comparecencia no ha de convertir los procedimientos a dicho idioma en virtud de la Regla 8.5 de Procedimiento Civil, *supra*, éste puede presentar su escrito en el idioma inglés. Por contar este Tribunal con un Negociado de Traducciones, como cortesía a dicho estado y por vía de excepción, se puede ordenar al señor Secretario del Tribunal que, inmediatamente que el estado de Nueva York presente su escrito como *amicus curiae*, remita el mismo al Negociado de Traducciones para que éste efectúe prioritaria y urgentemente su traducción al idioma español y, efectuada la misma, la una a los autos y remita copia a todas las partes. Una vez remitida dicha traducción a las partes, se les puede conceder un término para exponer lo que a bien tengan en relación con la comparecencia del estado de Nueva York.

*Se emitirá una orden de conformidad con los términos de esta opinión.*

Los Jueces Asociados Señores Negrón García y Rebollo López emitieron votos disidentes.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

La decisión mayoritaria de hoy, suscrita por el Juez Presidente Señor Pons Núñez, autoriza sólo al Procurador General (*Attorney General*) del estado de Nueva York, Hon. Robert Abrams, a presentar un alegato de *amicus curiae*. Como tal, es *RESTRICTIVA, PRO FORMA, FÚTIL Y TRUNCA*.

*RESTRICTIVA*, pues da la impresión de haber olvidado que aquí gira el debate en torno a la constitucionalidad del *Departamento de Asuntos de la Comunidad Puertorriqueña en ESTADOS UNIDOS* (el Departamento). Como sugiere su nombre, este Departamento se proyecta sobre *todos* los estados de la Unión, no sólo Nueva York.

*PRO FORMA* pues, para todos los propósitos, la decisión mayoritaria ya prejuzgó y resolvió acorde con la posición inicialmente anticipada por el Hon. Robert Abrams. Al respecto concluye:

> *No existe prueba en el legajo de este caso* de que el Estado Libre Asociado de Puerto Rico, por conducto de sus poderes constituidos, tenga designios, que podrían describirse como *extraterritoriales, de atentar contra la política pública individual de los respectivos estados y la nacional de Estados Unidos de América y menoscabar la soberanía de todos ellos*. (Énfasis suplido.) Opinión mayoritaria, pág. 980.

Oportunamente demostraremos que esta conclusión es errónea. Existe evidencia inequívoca de todo lo contrario.

*FÚTIL Y TRUNCA*, pues sin válidos fundamentos se han negado a *TRADUCIR Y NOTIFICAR todos los documentos en autos pertinentes y a INVITAR* a los Procuradores de seis (6) otros estados y al Secretario de Justicia federal, Hon. Richard Thornburg, *que están en iguales circunstancias* que el estado de Nueva York.

## I

En este caso el Gobernador, Hon. Rafael Hernández Colón, y la Secretaria del Departamento, Hon. Nydia I. Velázquez Colón, apelan la sentencia del Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez), que declaró inconstitucional dicho Departamento creado por la Ley Núm. 58 de 16 de agosto de 1989 (3 L.P.R.A. secs. 443–443o).

En su sentencia, el ilustrado foro de origen dispuso:

> Se estima la demanda y salvo los servicios prestados en Estados Unidos por el Programa de Trabajadores Agrícolas en coordinación con el Departamento del Trabajo y Recursos Humanos, se declara inconstitucional la Ley Núm. 58 del 16 de agosto de 1989 que creó el Departamento de Asuntos de la Comunidad Puertorriqueña en los Estados Unidos.
>
> En lo que respecta a la función de fomentar la participación de los puertorriqueños en los procesos electorales estadounidenses, se emite auto de [*injunction*] permanente contra la Secretaria del Departamento de Asuntos de la Comunidad Puertorriqueña en los Estados Unidos, Hon. Nydia I. Velázquez, sus sucesores en el cargo y los empleados de ese Departamento y se les prohíbe llevar a cabo dicha función. Se ordena además, que todos aquellos r[é]cords levantados para propósitos de inscripción electoral sean entregados inmediatamente a los organismos electorales competentes de las distintas ciudades y estados en donde se han efectuad[o] campañas de inscripción (véase nota 2) y a la Comisión Estatal de Elecciones de Puerto Rico para cualquier uso eventual. Apéndice II, págs. 38–39.

Dicho foro clasificó como "paradoja" que en su *Exposición de Motivos* la Ley Núm. 58 de un lado rechace la existencia de *una* comunidad cultural puertorriqueña en Estados Unidos "como entidad separada y no incorporada a Puerto Rico" y, no obstante, promueva su integración y asimilación a esa nación mediante el fomento y participación en sus procesos electorales.

En abono de su dictamen elaboró múltiples fundamentos. En pocas palabras, determinó que, en su aplicación, la Ley Núm. 58 INVADÍA LA SOBERANÍA JURÍDICA del estado de Nueva York; que dicho Departamento CARECÍA DE SEDE *en* Puerto

Rico, y que USAR FONDOS PÚBLICOS PARA FOMENTAR LA PARTICIPACIÓN ELECTORAL DE NO RESIDENTES ERA CONTRARIA al Art. VI, Sec. 9 y al Art. II, Sec. 19 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

Sobre la corrección y juridicidad de esa sentencia, basta por ahora remitirnos al *voto disidente* del pasado 27 de septiembre de 1990. Allí sintetizamos nuestra posición y razón de decidir (*ratio decidendi*) en la frase *"IDENTIDAD CULTURAL NO ES SI-NÓNIMO DE JURISDICCIÓN CONSTITUCIONAL EXTRA-TERRITORIAL". Hernández Torres v. Hernández Colón et al.,* 127 D.P.R. 449, 450 (1990).

Con estos breves antecedentes en mente, concentrémonos en la petición del Hon. Robert Abrams. La ausencia de precedente nos obliga.

## II

*La cortesía y civilidad judicial* nos exigen prescindir de los requisitos de nuestro diseño estatutario, reglamentario y jurisprudencial[1] para dar paso a la comparecencia del Hon. Robert Abrams y su asistente Hon. Siobhan Shanks, en *interés* y

---

[1] En lo atinente, la Sec. 7 de la Ley Núm. 17 de 10 de junio de 1939, según enmendada, 4 L.P.R.A. sec. 740, dispone que ninguna persona que no haya sido autorizada por el Tribunal Supremo de Puerto Rico "podrá dedicarse al ejercicio de la profesión de abogado, ni anunciarse como tal, *ni como agente judicial, ni gestionar, con excepción de sus asuntos propios, ningún asunto judicial o cuasijudicial ante cualquier tribunal judicial . . .".*

En el descargo de esa función regulatoria, exigimos que todo aspirante a la profesión haya aprobado la reválida y obtenido un certificado acreditativo de buena reputación. *Regla 11(a) y (c) del Reglamento del Tribunal Supremo,* 4 L.P.R.A. Ap. I-A. A manera de excepción, por cortesía, en casos particulares podemos autorizar a una persona admitida al ejercicio de la abogacía en un estado o territorio de Estados Unidos o Distrito de Columbia.

Para ello, de ordinario, es indispensable que el interesado presente una solicitud de admisión por cortesía endosada por un abogado autorizado a ejercer la profesión ante nos y un certificado de admisión y buena conducta (*good standing*) expedido por el más alto tribunal del estado en el cual el solicitante está admitido. Además, *en la solicitud deberá constar que domina el idioma español.* De lo contrario, la autorización estará supeditada a que lo acompañe un abogado de este foro que domine el idioma español. Regla 11(d) del Reglamento del Tribunal Supremo, *supra.*

Por otro lado, la Regla 8.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III, exige que las alegaciones, solicitudes y mociones se formulen en el *idioma español.* Para personas que desconocen este idioma, se autoriza la formulación de escritos en el vernáculo de esa

en *representación* del estado de Nueva York (Poderes Ejecutivo y Legislativo). Incuestionablemente ambos son altos funcionarios gubernamentales —el primero electo y el segundo designado— en la jerarquía y dirección del *Departamento Legal* de ese estado.

Notamos también que su solicitud ha sido suscrita en el idioma inglés. Al respecto, el Hon. Robert Abrams nos pide que igualmente así aceptemos su alegato.

Este Tribunal no es ente *supralegal; a contrario sensu*, es custodio de unos valores tradicionales y del ideal del más fiel cumplimiento de la ley. Es perfectamente natural y comprensible, pues, que se cumpla con el requisito de copias en español. DESPUÉS DE TODO, EL VERNÁCULO SIGUE SIENDO EXPRESIÓN CULTURAL DISTINTIVA DE NUESTRO PUEBLO.

Para facilitar la comparecencia del Hon. Robert Abrams —y de cualesquiera otros funcionarios— nos anima el mismo espíritu de cortesía. Por ende, es apropiado que sea el *Negociado de Traducciones* de este Tribunal el que prioritariamente traduzca ese y cualesquiera otros escritos que sean presentados en inglés. DEL MISMO MODO, Y PARA SER NOTIFICADOS SIMULTÁNEAMENTE —COMO MÍNIMO— DEBERÍAN OFICIALMENTE TRADUCIRSE LA RESOLUCIÓN DEL TRIBUNAL, ESTA OPINIÓN, NUESTRO DISENSO ANTERIOR, LA SENTENCIA DEL FORO DE ORIGEN Y LOS ALEGATOS PRINCIPALES DE LAS PARTES.

## III

La Regla 43 de nuestro Reglamento, 4 L.P.R.A. Ap. I-A, visualiza la participación como *amicus curiae* de personas realmente interesadas. Nuestros pronunciamientos en *Pueblo ex rel.*

---

persona, *siempre que se acompañen las copias necesarias en español*. Ello responde a claros pronunciamientos: "Es un hecho no sujeto a rectificaciones históricas que el vehículo de expresión, el idioma del pueblo puertorriqueño —parte integral de nuestro origen y nuestra cultura hispánica— ha sido y sigue siendo el idioma español. . . . [E]sa es una realidad que no puede ser cambiada por ninguna ley." *Pueblo v. Tribunal Superior*, 92 D.P.R. 596, 604 (1965).

*L.V.C.*, 110 D.P.R. 114 (1980), reflejan las peculiaridades de la institución de *amicus curiae*. Aparecen ratificados en *Pueblo v. González Malavé*, 116 D.P.R. 578, 580 (1985):

(1) la comparecencia no se funda en un derecho, sino en un privilegio sujeto a la sana discreción del tribunal; (2) su participación se justifica en casos revestidos de interés público; (3) más que al interés del *amicus curiae, debe responder a las necesidades del tribunal con el propósito de estar mejor informado,* y (4) "no debe darse la intervención para que se convierta en una parte del litigio". (Énfasis suplido.)

Confrontadas estas características con la solicitud del Hon. Robert Abrams, nos preocupan sobremanera las interrogantes siguientes:

*Primero,* su deber como principal abogado y representante legal del estado de Nueva York es de comparecer ante los foros de *esa* jurisdicción o aquellas cortes *federales* a sostener la constitucionalidad de los estatutos *allí* aprobados. N.Y. Exec. Law Sec. 71 (McKinney 1982); 28 U.S.C. sec. 2403(b). ¿QUÉ INTERÉS JURÍDICO PUEDE TENER PARA, *SUA SPONTE*, INTERVENIR AQUÍ EN PUERTO RICO?

*Segundo,* no sabemos cómo advino en conocimiento de esta apelación ni cuán empapado está del escenario de los hechos que la originan y los respectivos argumentos de las partes. Ello tal vez explica —aunque no deja de ser inquietante— que su comparecencia, *a priori*, sea limitada. En el acápite tres (3) de su moción nos dice que es con el solo propósito de brindarnos su *creencia* (*belief*) de que "el establecimiento de campañas de inscripción de electores, lejos de ser una intromisión impermisible en la soberanía del estado de New York es consistente con su política pública de promover la participación en el proceso electoral". (Traducción nuestra.) Brief of *Amicus Curiae* Robert Abrams, Attorney General of the state of New York, in Support of the Defendants-Apellants, pág. 8. *EX FACIE, NO ES SUFICIENTE.* Aun en materias en que dicho funcionario emite una opinión formal sobre asuntos de su clara competencia, su posición es simplemente *persuasiva* y no obliga a los foros judiciales de la jurisdicción

neoyorquina. *American Tel. & Tel. Co. v. State Tax Com'n.*, 462 N.E.2d 1152, 1157 (N.Y. 1984).

SIN TRADUCIRSE NI REMITÍRSELE LA SENTENCIA DEL TRIBUNAL DE INSTANCIA, ALEGATOS PRINCIPA-LES Y NUESTROS DISENSOS, ESTO ES, SIN EL CONOCI-MIENTO CABAL DE LOS HECHOS Y DE LOS ARGUMEN-TOS, ¿PUEDE OPINAR SERIAMENTE EL HON. ROBERT ABRAMS? ¿QUÉ VALOR HA DE TENER ANTE NOS SU "CREENCIA"? ¿IGUAL QUE EN NUEVA YORK O MENOS? ¿Dónde queda la afirmación de la mayoría de que es *"importante* para este Tribunal obtener la *mayor información posible* sobre esas cuestiones"? (Énfasis suplido.) Opinión mayoritaria, pág. 979. ¿POR QUÉ SE NIEGAN A AUTORIZAR ESE TRÁMITE?

Y *tercero*, la controversia ante nos es más dilatada; gira en torno a si bajo nuestra Constitución —y federalismo— es válido el financiamiento gubernamental de campañas de inscripción en los distintos estados de Estados Unidos para beneficio de un grupo étnico en particular que *no es residente* de Puerto Rico.

## IV

PARA QUE EL HON. ROBERT ABRAMS PUEDA COMU-NICAR SATISFACTORIAMENTE SU POSICIÓN, TIENE PRIMERO QUE CONOCER TODOS LOS HECHOS. SON DRAMÁTICOS Y REVELADORES. Durante el año fiscal 1989–1990 el presupuesto de este Departamento fue de $2,186,747. Para el año fiscal 1990–1991 se solicitaron a la Asam-blea Legislativa seis millones, ciento ochenta y un mil, seiscientos sesenta y dos dólares ($6,181,662). Parte de los fondos desembol-sados se usaron por la *Oficina de Prensa y Relaciones Públicas* de dicho Departamento para pagar campañas publicitarias a través de la radio, prensa y televisión en las actividades bajo el *Programa de Orientación y Organización Política.* ¿QUÉ ES ESTE PROGRAMA?

Según lo caracterizó la propia codemandada, Hon. Nydia I. Velázquez, Secretaria del Departamento, se trata de un "instru-

mento de acción política". Vistas Públicas de la Comisión de Hacienda de la Cámara de Representantes de 18 de mayo de 1990, pág. 2. En esa ocasión ella también aceptó que el programa "ha estado dando asistencia *directa* a los grupos puertorriqueños organizados para participar en las elecciones municipales de distintos condados *en el Estado de New Jersey*". (Énfasis suplido.) Íd., pág. 3. Además, declaró que "[u]n promedio de treinta y cinco hispanos y puertorriqueños, corrieron sus candidaturas para distintos cargos en los condados de Paterson, Newark y Trenton. Íd. De estos treinta y cinco (35) candidatos, treinta (30) eran puertorriqueños". Íd., págs. 2 y 3. Finalmente, admitió que en el *futuro* —próximo año fiscal— el programa continuará con esa acción política "en aquellas ciudades con alta concentración de puertorriqueños". Íd., pág. 3.

No es necesaria mucha elucidación para entender que, despojado este Departamento de su liviano ropaje jurídico, la realidad es que estamos ante un programa gubernamental en el área electoral de múltiples "estrategias". Informe al Consejo Asesor del Gobernador sometido por la Secretaría del Departamento de junio de 1990, pág. 7.

En ese mismo informe, la Hon. Secretaria Velázquez reconoció que el *uso de fondos públicos del Estado Libre Asociado* ha "*permitido*" que varios puertorriqueños *hayan sido electos* para representar a la comunidad en escaños de servicio público. Se ha logrado *representación* en Camden, Paterson, Perth Ambay, también se ha logrado *representación* en *Connecticut*, y en New York *logramos mantener la representación del Distrito Congresional Núm. 18* [Hon. José C. Serrano]". Informe, *supra*.

## V

Ante estos hechos surgen varias preguntas sobre las cuales el Hon. Robert Abrams debería ilustrarnos. Expongámoslas capsularmente.

En términos de soberanía, ¿es equivalente o igual el solventar la promoción de inscripción y la participación en los comicios

electorales del estado de Nueva York, cuando se trata de entidades o cabilderos *privados, vis-à-vis* el Gobierno de Puerto Rico? Si hay diferencias, ¿ameritan trato distinto?

Esta promoción electoral gubernamental va dirigida a favorecer al grupo étnico de puertorriqueños. ¿Fomenta o crea fricciones entre las distintas facciones étnicas en dicho estado? De permitirse, ¿no implica ello un *reconocimiento y admisión oficial* del estado de Nueva York de que otros gobiernos, *incluso extranjeros*, directa e indirectamente pueden intervenir, financiar y participar activamente en la formación y elección de sus funcionarios del gobierno estatal y local? ¿Puede justificarse esta intromisión por el solo fundamento de que los candidatos poseen características raciales y culturales *afines* a los intereses del gobierno interventor, aquí el E.L.A.?

*EL ESCLARECIMIENTO DE ESTAS SENSIBLES CUESTIONES ES CRUCIAL. SI REFLEXIONAMOS UN POCO, VA MÁS ALLÁ DEL ASPECTO DE SOBERANÍA. PENETRA EN LA MÉDULA DE LAS LEYES ELECTORALES ESTATALES. VEAMOS.*

## VI

Según antes expuesto, a través de este Departamento y con fondos públicos el Gobierno de Puerto Rico ha promovido exitosamente las candidaturas *específicas* de varios puertorriqueños en Nueva Jersey, Connecticut y Nueva York. En el ámbito electoral federal, al decir de la propia Hon. Secretaria Nydia Velázquez, "logramos mantener la representación del Distrito Congresional Núm. 18 [Hon. José C. Serrano]". Informe, *supra.*

Ante esta *realidad*, ¿cae o no este Departamento dentro del significado de "*Comité Político*" de la Ley Electoral de Nueva York? Sus gastos (*expenditures*), ¿deben ser informados o investigados por el organismo regulador? ¿La Junta Estatal de Elecciones (*State Board of Elections*), ha intervenido? Más aún, ¿ese organismo ha investigado, autorizado u opinado sobre el particular? N.Y. Exec. Law Sec. 14-100 *et seq.* (McKinney 1982).

Es claro, pues, que para evitar que la comparecencia del Hon. Robert Abrams no sea *pro forma* y realmente tenga algún valor persuasivo, debe estar él familiarizado con estos *incontrovertidos hechos* e *ilustrarnos* sobre los extremos antes apuntados.

Y es obvio, además, que por razón de concurrir circunstancias fácticas parecidas y existir leyes electorales análogas, debemos, al menos, invitar como *amicii* a los Procuradores Generales o sus concordantes de los estados de Illinois —Ill. Ann. Stat. ch. 46, para. 9-1 (Smith-Hurd 1991)— *Pennsylvania* —Pa. Stat. Ann. tit. 25, Sec. 3241 (d)(f) *et seq.* (Purdon 1991)— *Ohio* —Ohio Rev. Code Ann. Sec. 3517.01 *et seq.* (Anderson 1988)— *Connecticut* —Conn. Gen. Stat. Ann. Sec. 9-333 *et seq.* (West 1989)— *New Jersey* —N.J. Stat. Ann. Sec. 3A *et seq.* (West)— y *Florida* —Fla. Stat. Ann. Sec. 106.011 *et seq.* (West 1982)— pidiéndoles la misma ilustración.

La razón es evidente. Si admitimos la comparecencia y "opinión" del Hon. Robert Abrams —coincidente *prima facie* con la expuesta en su alegato por el Gobierno de Puerto Rico— es debido a que como *amicus curiae* responderá a las necesidades de este Tribunal: "estar mejor informado". *Pueblo v. González Malavé*, supra. Si, como afirma la mayoría, él es el "mejor" para informarnos (opinión mayoritaria, pág. 979), entonces, ¿por qué no hacer extensiva la invitación y oir las opiniones, al menos, de los procuradores de esos otros seis (6) estados?

Y ciertamente es *compulsorio* incluir al Hon. Richard Thornburgh, Secretario de Justicia de Estados Unidos. ADVIÉRTASE QUE EL FINANCIAMIENTO Y EL ENDOSO DIRECTO O INDIRECTO EN LA REELECCIÓN DEL CONGRESISTA, HON. JOSÉ C. SERRANO, PARA EL DISTRITO NÚM. 18, PLANTEA LAS MISMAS CUESTIONES BAJO LA LEY ELECTORAL FEDERAL. 2 U.S.C. sec. 431 *et seq.*

## VII

Según visto, el problema que conlleva la aplicabilidad de la Ley Núm. 58 es novel, complejo y muy serio. Trasciende los

límites geográficos del estado de Nueva York y, naturalmente, la "creencia" *bona fide* —exclusiva o no— del Hon. Robert Abrams. Potencialmente, el *spectrum* de opiniones legales y conflictos constitucionales es muy amplio.

Las interrogantes legítimas podrían multiplicarse y convertirse en una "caja de pandora". ¿Cómo conocer este Tribunal que los estados de *Illinois, Pennsylvania, Ohio, Connecticut, Nueva Jersey* y la *Florida* están de acuerdo en que *oficialmente* el Gobierno de Puerto Rico promueva, intervenga y financie unos procesos de inscripción electoral en sus jurisdicciones con el propósito —a corto y largo plazo— de elegir puertorriqueños o sus descendientes a puestos públicos? ¿Qué del Gobierno federal? *LA ADQUISICIÓN DE ESTE VITAL CONOCIMIENTO SÓLO ES POSIBLE TRADUCIÉNDOSE LOS DOCUMENTOS ANTES ALUDIDOS E INVITANDO A ESOS ESTADOS Y AL GOBIERNO FEDERAL PARA QUE COMPAREZCAN A ILUSTRARNOS. No basta la sola* comparecencia del Hon. Robert Abrams. Así balanceamos los intereses en colisión. Por la autorización que nos confiere la Regla 43 del Reglamento del Tribunal Supremo, *supra, motu proprio* a hacerlo, la negativa mayoritaria es incomprensible. POR *PRIMERA VEZ* EN LA HISTORIA DEL TRIBUNAL SE DA EL ABSURDO DE AUTORIZAR TRADUCCIONES DE UN SOLO ESCRITO Y EN UNA *SOLA DIRECCIÓN.* ¿ES ASÍ COMO SUPUESTAMENTE ESTAMOS MEJOR INFORMADOS?

Y, POR *SEGUNDA VEZ*, con todo respeto, venimos obligados a denunciar ante el país el abusivo trato mayoritario en cuanto a criterios disidentes.

La Ley Núm. 19 de 11 de abril de 1968, según enmendada, 4 L.P.R.A. sec. 490, prescribe que nuestras opiniones sean "rápida" y eventualmente publicadas en español e inglés. La traducción será efectuada por el *Negociado de Traducciones del Tribunal.* La mayoría nos ha negado *AHORA* la traducción *oficial* al idioma inglés de este disenso.

Como razones hemos ponderado y considerado las expuestas por el Juez Presidente Señor Pons Núñez. Opinión mayoritaria,

pág. 978 esc. 2. Allí, en su primer párrafo, aduce que debido a que el Hon. Robert Abrams y sus ayudantes no lo han "planteado", tal vez puedan leer y entender el español, aunque no escribirlo correctamente. De más está decir que la premisa es errónea y el argumento completamente ESPECULATIVO.

Incidentalmente aclaramos que, al cabo de veinte y cinco (25) años en la Judicatura, coincidimos con el Juez Presidente Señor Pons Núñez "de que existen muchas personas *en todos los niveles* que tienen conocimientos suficientes de un idioma para leerlo y entenderlo, *pero que no pueden escribirlo correctamente*". (Énfasis suplido). Opinión mayoritaria, pág. 979 esc. 2. Ello es una verdadera tragedia cuando se trata del español y el autor es puertorriqueño.

Su otro argumento es bien *simple*: o se traducen todos los documentos o nada; esto último, a juicio suyo no es "aceptable", pues convertiría "al idioma inglés los procedimientos". Confesamos que de la lectura de este argumento no hemos podido entender su lógica. Este razonamiento circular nos recuerda el refrán *"palo si bogas y palo si no bogas"*.

Sólo sabemos que de inmediato ello privaría al Hon. Robert Abrams de conocer *estos* criterios diferentes. De nuevo, *en vano* han tratado de imponernos una nueva modalidad de *MORDAZA JUDICIAL. Nogueras v. Hernández Colón*, 127 D.P.R. 716, 732 (1990), voto preliminar de 10 de septiembre de 1990. *PARA REMOVERLA, HEMOS TRADUCIDO ESTE DISENSO PERSONALMENTE E INCORPORADO COMO APÉNDICE I.*

Los jueces estamos continuamente expuestos a las intemperies de la vida política, a los grandes acontecimientos. y a las mutaciones de la historia. Precisamente por esta razón, en situaciones como la de autos en que la génesis de la controversia jurídica es de naturaleza político-partidista, DEBEMOS SER MUY CUIDADOSOS AL EVALUAR COMPARECENCIAS A TÍTULO DE *AMICUS CURIAE* QUE A VECES PUEDEN SER UNA FORMA LEGAL NORMAL, PERO SOFISTICADA, DE INFLUENCIA POLÍTICA. Robert F. Nagel, *Political*

*Pressure and Judging in Constitutional Cases*, 61 U. Colo. L. Rev. 685 esc. 3 (1990).

## (APÉNDICE I)
## IN THE SUPREME COURT OF PUERTO RICO

Mr. Justice Negrón García, dissenting.

Today's majority decision delivered by Chief Justice Mr. Pons Núñez *only* authorizes the Attorney General of the State of New York, Hon. Robert Abrams, to file a brief as *amicus curiae.* As such, it is *RESTRICTIVE, PRO` FORMA, MAIM* AND *WORTHLESS.*

*RESTRICTIVE,* because it gives the impression that they have forgotten that the debate here centers on the constitutionality of the *Puerto Rican Community Affairs Department in the UNITED STATES* (Department). As its name suggests, the aforementioned Department extends its services throughout all the states, not only in New York.

*PRO FORMA,* because for relevant purposes, the majority decision has prejudged and resolved in advance under the forestall initial position conveyed by the Hon. Robert Abrams. In this respect the majority, has concluded:

> In the record of this case there is no evidence that the Commonwealth of Puerto Rico, through its designated powers, has any intentions, of what we may describe as *extra-territorial, attempts against the individual public policies of the respective states and national of the United States of America and impair their sovereignty.* (Emphasis supplied.) Opinion of the Court at 980.

We will show further ahead that this conclusion is erroneous. There is unequivocal evidence to the contrary.

*MAIM AND WORTHLESS,* because, without valid grounds, they have denied TRANSLATING AND DELIVERING all pertinent documents in record and have not extended an INVITATION to six (6) other state Attorney Generals and the United States Attorney General, Hon. Richard Thornburg; which are under the *same circumstances* as the state of New York.

# I

In this case Governor Hon. Rafael Hernández Colón and the Department's Secretary, Hon. Nydia I. Velázquez Colón, appeal a Judgement rendered by the Superior Court, San Juan Section (Hon. Arnaldo López Rodríguez, Judge), declaring unconstitutional the aforesaid Department, as created by Law No. 58 of August 16, 1989 (3 L.P.R.A. secs. 443–443o).

In its Judgment the Superior Court adjudicated:

> Complaint is granted, and except for those services offered in the United States by the Agricultural Workers Program in coordination with the Labor and Human Resources Department, the Act No. 58 of August 16, 1989, which creates the Puerto Rican Community Affairs Department in the United States is declared unconstitutional.
>
> In regards to the promotion of Puerto Rican participation in the United States electoral process, a permanent injunction is issued against the Secretary of the Puerto Rican Community Affairs Department in the United States, Hon. Nydia I. Velázquez, her successors in said position and Department employees are restrained from discharging that function. It is further ordered that all records obtained for voting registration purposes should be immediately delivered to the pertinent electoral entities of the different cities and states wherever these electoral registration campaigns have been conducted (see note 2) and to the Puerto Rico Electoral Commission in case of any further use. App. II at 38–39.

The Court classified as "paradoxical" the fact that in its *Statement of Purposes*, Act No. 58 on one hand rejects the existence of a Puerto Rican Cultural Community in the United States "as a separate entity and unincorporated to Puerto Rico", and meanwhile it promotes the integration and assimilation to that nation by sponsoring participation in its electoral processes.

To further sustain its judgment, the Court elaborated several propositions. Succintly phrased, the Court determined that in its application Act No. 58 INVADED THE JUDICIAL SOVEREIGNTY of the State of New York; that the Department LACKED A PLACE OF BUSINESS *in* Puerto Rico, and that THE USE OF PUBLIC FUNDS TO PROMOTE ELECTORAL

PARTICIPATION OF NON-RESIDENTS WAS CONTRARY to Art. VI, Sec. 9 and Art. II, Sec. 19 of the Constitution of the Commonwealth of Puerto Rico, L.P.R.A., Vol. 1.

Regarding the correction and legality of this judgment, we should make reference for the moment to our *dissenting vote* filed last September 27, 1990. We synthetized therein our position (*ratio decidendi*) in the following manner: *"CULTURAL IDENTITY IS NOT A SYNONYM OF EXTRATERRITORIAL CONSTITUTIONAL JURISDICTION"*. *Hernández Torres v. Hernández Colón*, 127 D.P.R. 448, 450 (1990).

Bearing in mind this brief introduction, let us now concentrate on the Petition of Hon. Robert Abrams. The dearth of legal precedent obliges us.

## II

*Courtesy and judicial comity* demand that we lay aside our statutes, rules and decisions requirements,[1] to allow the

---

[1] In its pertinent part, Sec. 7 of Act No. 17 of June 10, 1939 (4 L.P.R.A. sec. 740) as ammended, provides that no person who has not been authorized by the Supreme Court of Puerto Rico "may engage in the practice of law, or advertise as such, or as judicial agent or act, except in regard to his own affairs, in any judicial or quasi-judicial matter before any court of law . . .".

In administering this regulatory function, we require that every applicant requesting admission to the legal profession approves a bar examination and obtain a certificate of good character. *Rule 11(a) and (c) of the Supreme Court*, 4 L.P.R.A. Ap. I-A. As an exception, in special cases and as a matter of courtesy, we may authorize a person who has been admitted to the legal profession in a state or territory of the United States, or District of Columbia.

For this, ordinarily, it is indispensible that the person presents a request for a courtesy admission endorsed by an attorney authorized to practice the legal profession before us, accompanied by a certificate of admission and of good standing issued by the highest court of the state in which the petitioner has been admitted. Furthermore, *in this request it must be stated that the applicant knows the spanish language* thoroughly, otherwise the authorization will be subject to his being accompanied by a lawyer from the Puerto Rican bar fluent in the spanish language. Rule 11(d) of the Supreme Court, *supra*.

On the other hand, Rule 8.5 of Civil Procedure, 32 L.P.R.A. Ap. III, demands that the pleadings, requests and motions be made in the *spanish language*. Persons who lack a knowledge of this language, are authorized to present their documents in their own language *provided they enclose the necessary copies in spanish*. This rule is in response to clear judgments: "It is a fact not subject to historical rectification that the vehicle of expression, the language of the Puerto Rican people —integral part of our origin and of our hispanic culture— has been and continues to be spanish . . . . [T]hat is a reality that cannot be changed by any law." *People v. Superior Court*, 92 P.R.R. 580, 588–589 (1965).

participation of the Hon. Robert Abrams and his assistant, Hon. Siobhan Shanks, representing the interests of the State of New York (Executive and Legislative Powers). Undoubtedly, both are high ranking public officials —the first by election and the second by appointment— in the hierarchy and administration of the *Legal Department* of said state.

We should also take notice that his motion has been written in the english language. The Hon. Robert Abrams requests that we accept his brief memoranda in the same idiom.

This Court is not a *supralegal* entity; *a contrario sensu*, it is the custodian of traditional values and of the ideal of faithful compliance of the law. It is perfectly natural and comprehensible, then, that he complies with the spanish copy requirements. AFTER ALL, THE VERNACULAR LANGUAGE CONTINUES TO BE THE DISTINCTIVE CULTURAL EXPRESSION OF OUR PEOPLE.

In order to facilitate the appearance of Hon. Robert Abrams —and of any other officer— the same spirit of courtesy enlivens us. Therefore, it is appropriate that it be the *Bureau of Translations* of this Court who expeditiously translates this and any other document that may be filed in english. IN THE SAME MANNER, AND TO BE NOTIFIED SIMULTANEOUSLY —AS A MINIMUM— THE FOLLOWING DOCUMENTS SHOULD ALSO BE OFFICIALLY TRANSLATED AND NOTIFIED SIMULTANEOUSLY: THE OPINION OF THIS COURT, THIS VOTE, OUR PREVIOUS DISSENTING VOTE, THE JUDGMENT OF THE SUPERIOR COURT AND, FINALLY, THE PRINCIPAL PLEADINGS OF THE PARTIES.

### III

Rule 43 of this Court's regulations, 4 L.P.R.A. Ap. I-A, contemplates the participation as *amicus curiae* of persons who are really interested on a given subject matter. Our statements in *People ex rel. L.V.C.*, 110 P.P.R. 114 (1980), reflect the peculiar

aspects of the institution of the *amicus curiae*. They appear ratified in *People v. González Malavé*, 116 P.R.R. 578, 580 (1985):

> (1) the brief is not grounded on a right but on a privilege subject to the sound discretion of the court; (2) the brief is justified in cases invested with public interest; (3) *more so than to the interest of the amicus curiae, it should respond to the needs of the court with the aim of being better informed*, and (4) "[t]he intervention of the *amicus curiae* cannot be admitted as a party". (Emphasis supplied.)

When we confront the aforementioned characteristics with the Hon. Robert Abrams request, we become highly concerned with the following issues:

*First*, his duty as principal lawyer and legal representative of the state of New York is to appear before the courts of *that* jurisdiction or its *federal* courts to defend the constitutionality of the statutes approved *therein*. N.Y. Exec. Law Sec. 71 (McKinney 1982); 28 U.S.C. sec. 2403(b). WHAT JURIDICAL INTEREST MAY HE HAVE TO JUSTIFY, *SUA SPONTE*, INTERVENTION HERE IN PUERTO RICO?

*Second*, we don't know how he became aware of this appeal, or how knowledgeable he is of the factual scenario which gave rise to this appeal and to the respective pleadings of the parties. This could explain —although it is still disturbing— that his *a priori* appearance is a limited one. In subsection (3) of his motion he states that his intervention is for the sole purpose of explaining to us his *"belief"* that the "establishment of voter registration campaigns, far from being an unwarranted intrusion upon the sovereignty of New York State, is consistent with our public policy of promoting participation in the electoral process". *EX FACIE, THIS IS INSUFFICIENT*. Even when this officer renders a formal opinion in regards to matters under his competency, his position is simply *persuasive* and is not binding to the court of New York. *American Tel. & Tel. Co. v. State Tax Com'n.*, 462 N.E.2d 1152, 1157 (N.Y. 1984).

CAN THE HON. ROBERT ABRAMS GIVE US A SERIOUS OPINION WITHOUT THE TRANSLATION AND DELIVERY OF JUDGMENT OF THE SUPERIOR COURT,

THE PRINCIPAL PLEADINGS AND OUR DISSENTING OPINIONS? THAT IS, WITHOUT FULL KNOWLEDGE OF THE FACTS AND PLEADINGS, HOW PERSUASIVE SHOULD HIS "BELIEF" BE? SHOULD IT BE VALUED THE SAME AS IN NEW YORK, OR LESS? Where does this leave the majority statement that "it is *important* for this Court to obtain *THE MOST AVAILABLE POSSIBLE INFORMA-TION* about these matters"? (Emphasis supplied.) Opinion of the Court at 978. WHY DOES THE MAJORITY DENY THAT PROCEDURE?

*Thirdly*, the controversy before us is much broader; the issue is whether under our Constitution —and federalism— the Commonwealth government may finance registration campaigns in different states of the United States for the benefit of a particular ethnic group who is *not a resident* of Puerto Rico.

## IV

IN ORDER FOR THE HON. ROBERT ABRAMS TO PROPERLY COMMUNICATE HIS POSITION, HE MUST FIRST BE AWARE OF ALL THE FACTS. THEY ARE DRAMATIC AND REVEALING. During the fiscal year 1989–1990 the Department's budget was $2,186,747. For the fiscal year 1990–1991 six million, one hundred eighty one thousand, six hundred sixty two dollars ($6,181,662) were requested to the Legislative Assembly. Part of the funds disbursed were used by the *Press and Public Relations Office* to pay for publicity campaigns through radio, press, and television in activities under the *Guidance and Policital Organization Program*. WHAT IS THIS PROGRAM?

As explained by the codefendant herself, Hon. Nydia Velázquez, Secretary of the Department, it is an "instrument of political action". Public Hearings, Treasury Commission, House of Representatives, May 18, 1990, p. 2. At that time she also accepted the fact that the program "had been giving *direct* help to the Puerto Rican groups organized to participate in the municipal

elections of the different counties *in the state of New Jersey"*. Id. at 3. She further averred that "thirty-five percent of hispanics and Puerto Ricans, filed their candidacies for different offices in the Counties of Paterson, Newark and Trenton. Id. "Out of these thirty-five (35) candidates, thirty (30) were Puerto Rican". Id at 2. She finally admitted that in the future —next fiscal year— the political action program would continue "in those cities with a high concentration of Puerto Ricans". Id. at 3.

Not much elucidation is required to understand that once this Department is deprived of its subtle juridical apparel, truly we are faced with a governmental sponsoring program of several "strategies" in the electoral area. Report to the Governor's Advisory Committee submitted by the Secretary of the Department, June, 1990, p. 7.

In the same report, Hon. Secretary Velázquez, acknowledged that the use of public funds of the Commonwealth of Puerto Rico has *"made possible* that several Puerto Ricans *have been elected* to represent the community in public service positions. *Representation* has been achieved in Camden, Paterson, Perth Ambay, *representation* has also been achieved in *Connecticut,* and in New York we were *able to keep the representation for Congressional District No. 18.* [Hon. José C. Serrano]". Report, *supra,* p. 7.

## V

These facts raise several issues, which the Hon. Robert Abrams should address. Let us state them briefly.

In terms of sovereignty, and compared with the Government of Puerto Rico, is the promotion of registration and participation in the electoral process of that state equivalent to that of *private* entities or lobbyists? If they are dissimilar, should they be treated differently?

This governmental electoral promotion is geared to favor the ethnic group of Puerto Ricans. Does this foster frictions between different ethnic groups in said state? If permitted, does this imply

an *official recognition and acknowledgment* by the state of New York, that other governments, *even foreign*, may directly or indirectly intervene, financially to participate in the election of its state and local government officers? Can this intrusion be justified only by the fact that the candidates have racial and cultural characteristics compatible to the interests of the intervening government, in this case the Commonwealth of P.R.?

*AN EXPLANATION OF THESE SENSIBLE ISSUES IS PARAMOUNT. IF PONDERED CONSCIENTIOUSLY, THIS MATTER GOES BEYOND THE ASPECT OF SOVEREIGNTY. IT PENETRATES THE ESSENCE OF STATE ELECTORAL LAWS.*

## VI

As explained, the Government of Puerto Rico has succesfully promoted the *specific* candidacies of several Puerto Ricans in New Jersey, Connecticut and New York with public funds through this Department. In the electoral federal area, Hon. Secretary Velázquez herself stated that: "we have been able to keep the representation of Congressional District No. 18 [Hon. José C. Serrano]". Report, *supra.*

In view of this *fact*, is the Department within the definition of a *"Political Committee"* in accordance to New York's Election Law? Should its *"expenditures"* be informed to the regulatory body? Has the New York State Board of Elections intervened? More over, has this regulatory body investigated, authorized or given its opinion regarding this matter? N.Y. Exec. Law Sec. 14–100 *et seq.* (McKinney 1982).

It is clear then that in order to prevent Hon. Robert Abrams' appearance from becoming a mere *formality*, he must be familiar with the above-mentioned *uncontroverted facts*, and he should explain the issues we have set forth.

It is also obvious that since there are similar factual circumstances and analogous elections laws, we should invite as *amici* the Attorney General or his fellow prosecutor for the states

of *Illinois* —Ill. Ann. Stat. ch. 46, para. 9–1 (Smith-Hurd 1991)— *Pennsylvania* —Pa. Stat. Ann. tit. 25, Sec. 3241(d)(f) *et seq.* (Purdon 1991)— *Ohio*—Ohio Rev. Code Ann. Sec. 3517.01 *et seq.* (Anderson 1988)— *Connecticut* —Conn. Gen. Stat. Ann. Sec. 9–333 *et seq.* (West 1989)— *New Jersey* —N.J. Stat. Ann. Sec. 3-A *et seq.* (West)— and *Florida* —Fla. Stat. Ann. Sec. 106.011 *et seq.* (West 1982)— requesting them their advise also.

The reason is evident. Should we allow the "opinion" of Hon. Robert Abrams —which coincides *prima facie* with the one expressed in the Government of Puerto Rico's brief— it is because as an *amicus curiae* will respond to the needs of this Court: "to be better informed". *People v. González Malavé, supra.* If, as the majority states, he is the "best" qualified to inform us (Opinion of the Court at 978), then why not extend this invitation and listen to other opinions, at least, of those of the six state attorney generals with similar election laws?

Certainly it would be *compulsory* to include Hon. Richard Thornburgh, the Attorney General of the United States. IT SHOULD BE BORNE IN MIND THAT THE FINANCING AND DIRECT OR INDIRECT ENDORSEMENT OF THE REELECTION OF HONORABLE CONGRESSMAN, JOSÉ C. SERRANO FOR DISTRICT NO. 18 PRESENTS THE SAME ISSUES UNDER THE FEDERAL ELECTION LAW. 2 U.S.C. sec. 431 *et seq.*

## VII

As presented, the problem surrounding the applicability of Act No. 58 is new, complex and very serious. It goes beyond the geographic boundaries of the state of New York, and thus, the *bona fide* "belief" —exclusively or not— of Hon. Robert Abrams. Potentially, the *spectrum* of legal opinions and constitutional conflicts is very broad.

The legitimate issues involved have a multiplying effect and could turn into a "pandora box". How can this Court recognize whether the states of *Illinois, Pennsylvania, Ohio, Connecticut,*

*New Jersey* and *Florida* agree with Puerto Rican Government *official* intervention, promoting, and financing electoral inscription processes in their respective jurisdictions for the —long and short term— purpose of electing Puerto Ricans or their descendants to public office? What about the federal government?

THE ONLY WAY WE CAN POSSIBLY OBTAIN THIS VITAL KNOWLEDGE IS BY TRANSLATING THE AFORMENTIONED DOCUMENTS AND BY INVITING THOSE STATES AND THE FEDERAL GOVERNMENT TO APPEAR AND ADVISE US. The sole appearance of Hon. Robert Abrams *is not enough.* In this manner we could balance the conflicting interests. Rule 43, *supra, motu proprio,* allows us to do it. The majority's denial has no explanation. FOR THE *FIRST TIME* IN THE HISTORY OF THIS COURT WE ARE FACED WITH THE ABSURD SITUATION WHERE ONLY ONE DOCUMENT TRANSLATION HAS BEEN AUTHORIZED WHICH FLOWS IN ONE DIRECTION. IS THIS HOW WE ARE SUPPOSEDLY "BETTER INFORMED"?

And for the *SECOND TIME*, with all due respect, we are forced to denounce the abusive treatment of the majority regarding dissenting votes.

Act No. 19 of April 11, 1968, as ammended, 4 L.P.R.A. sec. 490, commands that our opinions be "rapidly" and eventually published in Spanish and English. These translations are to be accomplished by the *Bureau of Translation of the Supreme Court.* The majority has denied, *NOW,* the official translation of this dissent.

We have explored and considered the reasons expressed by Chief Justice Mr. Pons Núñez. Opinion of the Court at 979 n. 2. In its first paragraph, he states that neither Hon. Robert Abrams nor his assistants have not "claimed" that they are unable to read and understand Spanish. He parts from the erroneus premise that this fact is indicative that Hon. Robert Abrams and his assistants can understand and read Spanish but do not write it

correctly. Enough to say that the argument is totally SPECULATIVE.

Incidentally we clarify that after twenty-five (25) years in the judiciary, we coincide with Chief Justice Mr. Pons Núñez "that there are a lot of people, in all places, that have enough knowledge in a language, to read and understand it, *but cannot write* it *correctly*". (Emphasis supplied.) Opinion of the Court at 979 n. 2. It is a real tragedy when the writer is Puerto Rican and the language is spanish.

His other argument is very *simple*: either all the documents are translated or none. This latter option, in his judgement, is not "acceptable" because it will transform "all the proceedings into the English language". We confess that we have been unable to understand its logic. This circular reasoning evinced, reminds us of the proverb *"damned if you do*, and *damned if you don't"*.

In the manner in which the translation of this opinion is omitted, Hon. Robert Abrams will be deprived from knowing our position. Again, in vain, efforts have been made to impose a new modality of *JURIDICIAL GAG. Nogueras v. Hernández Colón*, 127 D.P.R. 638, 654 (1990), preliminary vote, September 10, 1990. TO REMOVE IT WE HAVE PERSONALLY TRANSLATED AND INCORPORATED THIS OPINION AS APPENDIX I.

Judges are continually exposed to the hardships of political life, to great events and to the mutations of history. For these reasons, in situations such as the present one, where the genesis of the judicial controversy is of partisan-political nature, WE MUST BE VERY CAREFUL WHEN CALLED UPON EVALUATING AN *AMICUS CURIAE* APPEARANCE BEFORE THIS COURT. ALTHOUGH SOMETIMES THIS MAY BE THE NORMAL LEGAL CHANNEL, IT COULD ALSO CONSTITUTE A SOPHISTICATED FORM OF POLITICAL INFLUENCE. Robert F. Nagel, *Political Pressure and Judging in Constitutional Cases*, 61 U. Colo. L. Rev. 685 n. 3 (1990).

—O—

Voto disidente emitido por el Juez Asociado Señor Rebollo López.

Para poder opinar con responsabilidad, al igual que para poder decidir, *hay que conocer.*

Si es que la opinión (*belief*) del Procurador General del estado de Nueva York en algo nos va a ayudar a resolver la controversia que plantea el recurso ante nuestra consideración, *la misma debe ser una informada.*

Es por ello que, no obstante el esfuerzo mental realizado, *no* alcanzamos a comprender la negativa de una mayoría de los integrantes del Tribunal a ordenar que se traduzcan, por el Negociado de Traducciones de este Foro, la sentencia emitida por el tribunal de instancia, los alegatos de las partes y las distintas resoluciones y ponencias que se han emitido en el presente caso.

Cabe preguntarse: si el mencionado funcionario no conoce a fondo la controversia planteada, lo decidido por el tribunal de instancia, y las respectivas posiciones y alegaciones de las partes, *¿sobre qué va a opinar? ¿Cómo lo va a hacer? ¿No se corre el riesgo el Tribunal de que partes interesadas le proporcionen a dicho funcionario unas acomodaticias traducciones?*

I

Con el propósito de rebatir las antes señaladas interrogantes, la mayoría de los integrantes del Tribunal expresa —en el esc. 2 de la opinión mayoritaria— que:

> Dicho funcionario [el Procurador Abrams] no ha planteado que él o sus ayudantes desconozcan el idioma español al grado que ese desconocimiento no les permita leerlo y entenderlo. Sólo solicitan que se les permita presentar su escrito en el idioma inglés. *Esta petición es congruente con la experiencia cotidiana de que existen muchas personas en todos los niveles que tienen conocimientos suficientes de un idioma para leerlo y entenderlo, pero que no pueden escribirlo correctamente.*
> No resulta aceptable, como alternativa, la traducción al idioma inglés de sólo algunas partes del expediente. Si se ha de traducir

para un cabal entendimiento no debe hacerse selectivamente, sino en su totalidad. *Si así lo hiciéramos, estaríamos innecesariamente convirtiendo al idioma inglés los procedimientos en este caso.* (Énfasis suplido.)

Confesamos no poseer los "poderes sobrenaturales" que tiene la mayoría de los integrantes del Tribunal, "poderes" que le permiten a esa Mayoría *saber* que el Procurador General Abrams, aun cuando no puede expresarse correctamente en el idioma español, tiene suficientes conocimientos del mismo como para poder leerlo y entenderlo.

Por otro lado, traducir al idioma inglés, cuando menos, la sentencia emitida por el foro de instancia y los alegatos que han radicado las partes ante este Tribunal *no* tiene la consecuencia apuntada por la Mayoría de innecesariamente convertir "al idioma inglés los procedimientos en este caso". Íd. Lo que sí estaríamos garantizando, de así ordenarlo, sería que la comparecencia como *amicus curiae* del Procurador General del estado de Nueva York *fuera una debidamente informada para que así la misma nos pueda ser de verdadera ayuda en la solución final del recurso actualmente ante nuestra consideración*; ello con el propósito que siempre nos debe de animar al descargar nuestra función como el más alto tribunal apelativo del País: tener ante nosotros, antes de decidir, los elementos jurídicos correctos en la forma más completa posible, lo que nos permite, a su vez, resolver los casos de la manera más correcta posible.

Disentimos, en resumen, por cuanto no alcanzamos a entender la juridicidad de las razones aducidas por la mayoría del Tribunal en apoyo de su negativa a ordenar la traducción al idioma inglés de los escritos fundamentales que contiene el expediente del recurso del epígrafe.