HON. ZAIDA HERNÁNDEZ TORRES, ETC., peticionarios y apelados, *v.* HON. RAFAEL HERNÁNDEZ COLÓN, GOBERNADOR DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO ET ALS., demandados y apelantes.

*Número:* AC-91-833          *Resuelto:* 20 de diciembre de 1991

*Anabelle Rodríguez, Procuradora General*, abogada de los apelantes.

---

# RESOLUCIÓN

Atendida la moción radicada por la Oficina del Procurador General de Puerto Rico de fecha 18 de diciembre de 1991 en la cual solicita se "acorten los términos reglamentarios para presentación de los alegatos, a fin de que el asunto que plantea este caso quede sometido a la consideración de este Honorable Tribunal a la mayor brevedad posible" (Moción solicitando se acorten los términos reglamentarios, pág. 2), se declara con lugar la moción y, en su consecuencia, se concede a las partes hasta el martes 7 de enero de 1992, a las cinco de la tarde, para radicar los correspondientes alegatos.

Dada la naturaleza de la controversia planteada, se instruye al Banco Gubernamental de Fomento de Puerto Rico para que dentro del antes mencionado término, y en comparecencia separada, exprese su posición respecto a dicha controversia, ello en calidad de *amicus curiae*. En adición, se dispone la celebración de una vista oral, a ser efectuada la misma en el Salón de Sesiones del Tribunal Supremo el martes 14 de enero de 1992 a las 9:30 de la mañana.

*La presente Resolución deberá ser notificada a las partes por el Secretario General de este Tribunal, tanto por la vía ordinaria como telefónica.*

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió un voto preliminar disidente. El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Alonso Alonso no intervinieron.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

**– O –**

Voto preliminar disidente del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 23 de diciembre de 1991

"La verdadera esencia de un gobierno libre consiste en considerar los puestos [y fondos] públicos como un fideicomiso, encomendado para el bien del país y no para beneficio de determinado individuo o partido político." *Ex rel. Pérez v. Manescau*, 33 D.P.R. 739, 742–743 (1924). *Es inconstitucional la Resolución Conjunta Núm. 163 de la Asamblea Legislativa sobre el Presupuesto General para el año fiscal de 1991–1992.*

De hecho, en su apelación ante nos, los demandados Hon. Rafael Hernández Colón *et al.* no aducen un solo argumento contra los numerosos fundamentos que avalan el decreto emitido por el Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez) el pasado lunes 16 de diciembre de 1991. Su escrito se reduce a analizar las defensas clásicas levantadas —ya desgastadas— de falta de legitimación activa, academicidad y justiciabilidad.

Examinemos rápidamente esas defensas, comenzando con la legitimación activa (*standing*) de los legisladores reclamantes Hons. Zaida Hernández Torres y Edison Misla Aldarondo. El derecho individual que tienen los legisladores y otros funcionarios públicos de comparecer a los tribunales para reivindicar las prerrogativas de su cargo forma parte irreversible de nuestro repertorio jurisprudencial. *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 415–416 (1982); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988); *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991). En contraste con la Constitución federal, la nuestra reconoció y garantizó expresamente, como medio de fiscalización, a las minorías legislativas. "[E]s básico para la *salud democrá-*

*tica* que las minorías tengan una representación que, *aun bajo las circunstancias más desfavorables*, les permita cumplir adecuadamente su función de fiscalizar y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que puedan resultar en detrimento de la democracia." (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2590 (1952). La cuestión es tan trillada que aún bajo la experiencia norteamericana, "procede reconocerle a un legislador legitimación activa [*standing*] cuando demuestra que la actuación impugnada tiene el efecto de anular su voto, pasado o futuro, o cuando están en juego otros aspectos fundamentales de sus prerrogativas legislativas". (Traducción nuestra.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 153.

Aclarado este extremo, notamos que los hechos ante nos distan mucho de presentarse como una *cuestión política*. La controversia real es una *pura de derecho*: interpretar si el presupuesto es constitucionalmente válido (balanceado). Ello es función judicial por excelencia. Acoger la tesis del Estado representaría obliterar el sistema de separación de poderes. Convertiría a la Asamblea Legislativa y al Ejecutivo en jueces de sus propios actos. " '¡No corresponde ocuparse, naturalmente, *de aquellos otros que, impresionados por la vibración, diré sonora, de las palabras "cuestiones políticas"*, no penetran el concepto de la "justiciabilidad" y piensan, nada menos, que se pretende "politizar a la justicia" cuando lo que se quiere es *"despolitizar* a las soluciones jurídicas"...!' " (Énfasis suplido.) L.M. Boffi Boggero, *La función judicial y la abogacía*, 115 Rev. Jur. Arg. La Ley 1095, 1104 (1964).

Por último, el decreto de inconstitucionalidad *no es académico*. Subsiste al día de hoy la deuda incurrida por el Estado con la Autoridad de Energía Eléctrica ascendente a la suma de noventa y cuatro millones novecientos mil ochocientos diez dólares y cuarenta y ocho centavos

($94,900,810.48) en concepto del subsidio de tarifa residencial de abonados económicamente menos privilegiados con un consumo mensual no mayor de cuatrocientos (400) K.W.H., Ley Núm. 106 de 28 de junio de 1974 (22 L.P.R.A. sec. 212(b)(1)).

## I

Superados los obstáculos procesales, concentrémonos en la sustancia del recurso.

Las normas jurídicas que regulan este caso son de linaje constitucional. Nos referimos al imperativo de que el presupuesto gubernamental sea *balanceado* según la Sec. 7 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 369, que dispone:

> Las asignaciones hechas para un año económico *no podrán exceder de los recursos totales calculados* para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones. (Énfasis suplido.)

A renglón seguido, la Sec. 8 del mismo artículo, dispone:

> Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley. Const. E.L.A., *supra*, pág. 369.

Es frente a estas disposiciones que se manifiesta la controversia surgida por la Ley Núm. 106, *supra*, que autoriza e implanta el referido subsidio. Ésta fue enmendada por la Ley Núm. 4 de 8 de junio de 1981 a los fines de limitar su costo a cien millones de dólares ($100,000,000) anuales. Ese costo, sin embargo, pasó a constituir —por *mandato expreso* de la Asamblea Legislativa— "una *obligación* del Estado Libre Asociado de Puerto Rico que *deberá cubrirse*

de cualesquiera fondos *no comprometidos del Tesoro, no más tarde de sesenta (60) días a partir de la facturación mensual de la Autoridad al Departamento de Hacienda por este concepto*". (Énfasis suplido.) 22 L.P.R.A. sec. 212(b)(1). El Art. 2 de la Ley Núm. 4, *supra*, en lo pertinente, dispuso una asignación *autorrenovable*, a saber en "años subsiguientes, los recursos necesarios para continuar este programa *se consignarán en la Resolución Conjunta del Presupuesto General del Estado Libre Asociado*, disponiéndose que dicha cantidad consignada no excederá de cien (100) millones de dólares más cinco por ciento (5%) para imprevistos". (Énfasis suplido.) 1981 Leyes de Puerto Rico 83.

Es claro pues, que por su naturaleza, estamos ante una asignación cuyo destino está *predeterminado* por la Asamblea Legislativa y se repite anualmente hasta que dicho cuerpo determine lo contrario. *En consecuencia, ni el Gobernador Hon. Rafael Hernández Colón, como tampoco la Asamblea Legislativa, podían ignorar y dejar fuera del presupuesto esa obligación asumida por el Estado, como tampoco preterir o posponer su pago.* Esa actuación es claramente inconstitucional. Como sentenció el ilustrado foro de instancia:

> ... Ya mencionamos que originalmente (de 1974 a 1981) el costo del subsidio lo cargaba la A.E.E. En el 1981 se enmendó la ley para pasarle esa obligación al Fondo General. *Esa enmienda está en pleno vigor hoy día.* El Estado, a través del Fondo General, satisfizo el pago del subsidio hasta el año *1988*. Para ese año el Estado le adeudaba a la A.E.E. por concepto del subsidio la cantidad de $17,798.050, según el testimonio no contradicho del Contralor de la A.E.E. A partir de dicho año y hasta el corriente, el Estado no ha pagado el costo del subsidio, ni ha hecho asignación alguna en el Presupuesto para dicho fin. Con la excepción de un pago de $1,739,750,20 que hizo en agosto de 1989 (Véase Exhibit B, parte demandante). Esto ha hecho que se acumule una deuda que al 30 de junio de 1991 sumaba $94,900,910.48. Deuda que el Estado reconoce (Véase Exhibit IV, parte demandada). Ninguno de los testigos de am-

bas partes pudo explicar por qué razón el Estado dejó de pagar el subsidio desde el 1988. El Contralor de la A.E.E., Sr. Carlos E. Rodríguez Serrano, afirmó que es al Estado a quien le corresponde pagar el subsidio y no a la A.E.E.

Ni el Gobernador ni la Asamblea Legislativa *pueden pasar por alto el mandato de ley que les compele a asignar el dinero para el pago del subsidio. Mientras la ley continúe vigente hay que cumplirla.* Si el Gobernador o las cámaras legislativas desean alterar la carga del subsidio tienen que tomar acción afirmativa sobre la ley para modificarla o derogarla. Lo que no pueden hacer es obviar la asignación autorrenovable como si la ley no existiera, a pesar de que ésta continúa en pleno vigor sin que haya sido alterad[a] modificada en forma alguna y el subsidio se ha continuado brindando....

... Resolvemos que la omisión de la asignación en el presente Presupuesto para el pago del referido subsidio no queda subsanada con el alegado compromiso de presentar legislación *prospectiva.* (Énfasis suplido.) Anejo I, págs. 1W–1II.

## II

Dos notas finales. La primera: no albergamos dudas de que el acuerdo de 28 de octubre de 1991 firmado por el Director Ejecutivo de la Autoridad, Sr. José A. Del Valle, con el Director de Presupuesto, Sr. José M. Alonso García —Anejo VIII, pág. 108— es *nulo.* Como determinó el tribunal de instancia,

... El Contralor de la AEE, Sr. Rodríguez Serrano, se opuso a que el Sr. del Valle firmara este acuerdo y así lo testificó. También se opusieron los abogados de la AEE según se refleja del inciso séptimo del acuerdo. *La posición de todos ellos es que el subsidio le corresponde pagarlo al ELA.* A pesar de esta oposición el Director Ejecutivo de la AEE firmó el acuerdo. Este tribunal tiene serias dudas en cuanto a la validez legal de esta actuación. Entendemos que a tenor con la sección 4 de la Ley Núm. 83 de 2 de mayo de 1941, según enmendada, (22 L.P.R.A. sec. 194) es la Junta de Gobierno de la AEE quien tiene la facultad para comprometer a la corporación en acuerdos de este tipo. El Director Ejecutivo no puede firmar acuerdos de esta

naturaleza sin autorización expresa de esta Junta. (Énfasis suplido.) Anejo I, págs. 1GG–1HH.

La segunda: entre sus conclusiones, el respetado foro de instancia expuso:

Con relación a las deudas interagenciales por servicios prestados mayormente por corporaciones públicas a las agencias del gobierno tales como *electricidad, agua, teléfono*, etc., *no existe ley* que obligue al Gobernador a incluir asignaciones en el presupuesto para el pago total de esas deudas. El Gobernador en el ejercicio de su discreción puede proponer un plan de pago para amortizar esas deudas según dispuesto por el artículo 4 de la Ley Núm. 147, *supra*. (Énfasis suplido.) Anejo I, pág. 1RR.

En este extremo *incidió*. Ninguna de las leyes orgánicas creadoras de las Autoridades de Energía Eléctrica, de Acueductos y Alcantarillados y de Teléfonos les concedió autorización expresa para disponer gratuitamente de sus fondos, servicios o propiedades. 22 L.P.R.A. secs. 191–217 y 141–161; 27 L.P.R.A. secs. 401–424. En otras palabras, ni la electricidad, el agua o las facilidades de comunicación telefónica pueden ser suministrados gratis, no importa los fines legítimos o sociales involucrados. *El Gobernador ni la Asamblea Legislativa pueden retroactivamente variar esta restricción legal que está inexorablemente atada al esquema de corporaciones que operan mediante emisión de bonos, sin afectar e infringir el compromiso legal y la buena fe que tienen con sus bonistas.* Específicamente, en cuanto a la Autoridad de Acueductos y Alcantarillados, es revelador que "no prestará gratis ningún servicio. Los cargos por servicios rendidos al Gobierno de Puerto Rico y sus municipalidades (incluyendo el Gobierno de la Capital) serán considerados como *gastos ordinarios* del Gobierno de Puerto Rico y *deberán ser pagados de asignaciones hechas para tales fines*". (Énfasis suplido.) 22 L.P.R.A. sec. 158. Por su parte, la Autoridad de Energía Eléctrica tiene la *obligación legal de producir la energía al menor costo posible.*

Le está prohibido la cesión gratuita de servicios al propio gobierno estatal, "[en] la distribución eléctrica en la zona rural". 22 L.P.R.A. ant. sec. 221. Y de manera *terminante* la ley matriz de la Autoridad de Teléfonos dispone que las "Facilidades de Comunicación *no serán usadas gratis* por *ninguna* persona o *entidad*". (Énfasis suplido.) 27 L.P.R.A. sec. 408.

Con estos antecedentes, es obvio que la situación fiscal del país es sumamente delicada. *Mediante esquemas de papel, algunos legales, se ha empeñado, más allá de lo constitucionalmente permitido, el crédito de las corporaciones públicas que prestan servicios de primera necesidad.*

Ante estas tristes realidades, merece recordar una vez más que

> ... nuestro sistema de gobierno, cimentado en la doctrina clásica de frenos y contrapesos, esa conversión [política pública oficial y su] *implantación no es prerrogativa de un solo hombre, sino el producto de todo un proceso decisorio de génesis constitucional en que participa el Primer Ejecutivo y los miembros de la Asamblea Legislativa.* Cuando, como en el caso de autos, cualesquiera de esos dos (2) poderes hace caso omiso o se aparta de los métodos constitucionales, *o impermisiblemente se mezcla la acción partidista con la acción gubernamental oficial,* surge la confusa equivalencia de PARTIDOCRACIA COMO DEMOCRACIA. La cuestión, aunque de gran complejidad, ha sido objeto de diversos enfoques y teorías. La línea es tenue y difícil de trazar según lo acredita el Prof. Mark G. Yudof en su reputada obra *When Government Speaks,* University of California Press, 1983.

## I

Este Tribunal desaprovecha la oportunidad histórica de reafirmar dos (2) principios elementales. El primero, que en nuestra democracia el concepto dinámico de *política pública,* en su sustrato jurídico-doctrinario, está inexorablemente atado a la Constitución, a las leyes y, en casos apropiados, a los dictámenes judiciales. Y el segundo, que el *requisito constitucional de legalidad* en el desembolso del dinero público —"por autoridad de ley", Art. VI, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1, ed.

1982, pág. 369— *forma parte de un diseño fundamental para garantizar el crédito público, tan necesario para la salud y el mejoramiento económico del pueblo.* (Énfasis suplido y en el original.) *Noriega v. Hernández Colón,* 126 D.P.R. 42, 59–60 (1990), voto disidente.

En su oportunidad ampliaremos este disenso.