Hon. Zaida Hernández Torres, en su capacidad de Representante de la Cámara, apelada, *v.* Hon. Rafael Hernández Colón, Hon. Miguel Hernández Agosto, Hon. José R. Jarabo y Hon. Nydia I. Velázquez, todos en su carácter oficial, apelantes.

*Número:* AC-90-707        *Resuelto:* 16 de septiembre de 1992

594

*Lino J. Saldaña* e *Ilsa Y. Figueroa Arús,* abogados de los ape-
lantes; *Manuel D. Herrero García* y *Carlos Santiago Tavá-
rez,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión
del Tribunal.

Nuevamente tenemos que decidir si un legislador tiene
capacidad jurídica para impugnar la constitucionalidad de
una ley a la luz de nuestros recientes pronunciamientos en
*Hernández Torres v. Gobernador,* 129 D.P.R. 678 (1992).

Mediante recurso de apelación, el Gobernador de Puerto
Rico, Hon. Rafael Hernández Colón, y la Directora del De-

partamento de Asuntos de la Comunidad Puertorriqueña en Estados Unidos, Hon. Nydia I. Velázquez, nos solicitan que revisemos la sentencia dictada por el Tribunal Superior, Sala de San Juan, que declaró inconstitucional la Ley Núm. 58 de 16 de agosto de 1989, conocida como Ley del Departamento de Asuntos de la Comunidad Puertorriqueña (en adelante D.A.C.P.), 3 L.P.R.A. sec. 443 y ss. Revocamos.

## I

■ Con el objetivo de establecer una política pública en lo que respecta a los emigrantes puertorriqueños residentes en Estados Unidos, la Asamblea Legislativa aprobó la Ley Núm. 58 de 16 de agosto de 1989 (3 L.P.R.A. sec. 443 y ss.) mediante la cual se creó el D.A.C.P.[1] La política pública de este departamento está dirigida a "ayudar a la comunidad puertorriqueña que vive y se desempeña en los Estados Unidos, incluyendo a los trabajadores agrícolas migrantes, en su lucha por alcanzar la calidad de vida material y espiritual que le dignifique y enorgullezca ... así como el fortalecer los mecanismos que le habrán de permitir procurarse ella misma los medios para la convivencia digna en aquél medio social". Art. 3 de la Ley Núm. 58, *supra*, 3 L.P.R.A. sec. 443a.

El 17 de mayo de 1990 la Hon. Zaida Hernández Torres, en su condición de Representante a la Cámara, presentó una petición de sentencia declaratoria e *injunction* permanente en la que solicitaba que se declarase inconstitucional la ley que creaba el D.A.C.P. por entender que violaba el Art. I, Secs. 3 y 4, el Art. IV, Sec. 5, y el Art. VI, Sec. 9,

---

[1] Esta ley es producto del proyecto P. de la C. 580. En la Cámara de Representantes la votación fue la siguiente: treinta y tres (33) a favor, uno (1) abstenido y no se registraron votos negativos. Cuando se consideró en el Senado, la votación final fue de dieciocho (18) votos afirmativos y siete (7) votos negativos.

todos de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Sostenía que la asignación de fondos al D.A.C.P., por éste estar sito fuera de los límites territoriales de Puerto Rico, "le est[aba] causando un daño inmediato e irreparable al pueblo de Puerto Rico". Apéndice I a la moción en auxilio de jurisdicción, pág. 2. Además, que sus prerrogativas como legisladora se están viendo afectadas por tener que "legislar para la consideración y asignación de recursos a un departamento gubernamental creado mediante la aprobación de una ley inconstitucional". Apéndice I a la moción en auxilio de jurisdicción, pág. 2.

Por su parte, los codemandados presentaron una moción de desestimación, en la que sostenían la constitucionalidad de la ley y alegaban que la parte demandante carecía de acción legitimada (*standing*) aun "en su capacidad de ciudadana particular [o] en su condición de miembro de la Cámara de Representantes de Puerto Rico". Apéndice II a la moción solicitando que se de preferencia a la resolución de esta apelación a la luz de las normas sobre legitimación activa sentadas en *Hernández Torres et al. v. Hernández Colón et al.*, 92 J.T.S. 16, pág. 5.

Luego de varios incidentes procesales,([2]) el tribunal de instancia dictó sentencia para declarar inconstitucional la ley y emitió un *injunction* permanente contra la Secretaria del D.A.C.P. y sus empleados, prohibiéndoles que continuaran con sus funciones.([3]) Sin embargo, no surge de dicha

---

([2]) En cuanto a los codemandados Hon. Miguel Hernández Agosto y Hon. José Ronaldo Jarabo, el 10 de julio de 1990 el tribunal de instancia dictó sentencia parcial mediante la cual archivaba la demanda presentada en su contra.

([3]) El 26 de septiembre de 1990 los codemandados presentaron una moción en auxilio de nuestra jurisdicción, la cual resolvimos con un no ha lugar por ser académica, toda vez que la sentencia dictada no era firme y, por lo tanto, el *injunction* dictado no había cobrado vigencia según lo establecido en el Art. 678 del Código de Enjuiciamiento Civil, según enmendado, 32 L.P.R.A. sec. 3524. Véase *Hernández Torres v. Hernández Colón et al.*, 127 D.P.R. 448 (1990). Posteriormente, autorizamos la intervención a este pleito del Secretario de Justicia del estado de Nueva York. *Hernández Torres v. Hernández Colón et al.*, 127 D.P.R. 974 (1991).

sentencia o del expediente en autos que dicho tribunal resolviera si la parte demandante poseía legitimación activa para ser parte en este proceso judicial.

En su escrito de apelación, los peticionarios sostienen la constitucionalidad de la ley, pero no cuestionan la legitimación activa de la parte demandante.[4] Estando en posición de resolver, lo hacemos sin ulteriores procedimientos.

## II

El hecho de que en su escrito de apelación los codemandantes omitieran impugnar la legitimación activa de los apelados, no es óbice para que este Tribunal pueda motu proprio cuestionarse si dicha parte tiene la legitimación activa para la solicitud de un remedio judicial. Nos reafirmamos en que no podemos ceder ante la tentación de obviar los principios de legitimación activa para adjudicar los méritos de este caso. *Hernández Torres v. Gobernador*, supra. Este elemento de justiciabilidad difiere de los otros, puesto que gira principalmente "en torno a la parte que prosigue la acción y sólo secundariamente en cuanto a las cuestiones a adjudicarse". *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 723 (1980).

Después de todo, el examen de la legitimación activa es un mecanismo usado por los tribunales para delimitar su propia jurisdicción y no adentrarse en los dominios de otras ramas de gobierno,[5] y no lanzarse a resolver cuestiones hipotéticas o planteadas dentro de un contexto inadecuado. *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 399

[4] Sin embargo, en su alegato y en una moción presentada el 4 de mayo de 1992, nos piden que desestimemos esta acción porque la parte demandante carece de legitimación activa a la luz de nuestros pronunciamientos en *Hernández Torres v. Hernández Colón et al.*, supra.

[5] Véase A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U.L. Rev. 881 (1983).

(1983); A.M. Bickel, *The Passive Virtues*, 75 Harv. L. Rev. 40 (1961).

■ El principio de justiciabilidad nos impone el deber de examinar si las partes que pretenden un remedio judicial poseen legitimación activa. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958). Así, nos aseguramos "que el promovente de la acción es uno cuyo interés es de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 413 (1982); *Flast v. Cohen*, 392 U.S. 83, 99–100 (1968); *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989).

■ El promovente de la acción que solicita un remedio judicial deberá dejar demostrado: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no abstracto o hipotético; (3) una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que la causa de acción surge bajo el palio de la Constitución o de una ley. *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387, 392 (1980); *Hernández Agosto v. Romero Barceló*, supra. A modo ilustrativo, véanse: *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208 (1974); *Warth v. Seldin*, 422 U.S. 490 (1975); *Valley Forge College v. Americans United*, 454 U.S. 464 (1982); *Lujan v. Defenders of Wildlife*, 60 U.S.L.W. 4495 (1992).

■ Ahora bien, en el caso particular de los legisladores hemos reconocido que tienen legitimación activa en varias situaciones: por ejemplo, cuando la controversia trata sobre la elegibilidad del legislador a ocupar un escaño legislativo, *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); cuando alguna de las Cámaras ha autorizado a uno o varios legisladores a vindicar derechos y prerrogativas de dicha Cámara, *Hernández Agosto v. Romero Barceló*, su-

pra, pág. 413; *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983); cuando se cuestionan reglas senatoriales que coartan sus derechos constitucionales a participar en las etapas esenciales y significativas en las comisiones de la Cámara Alta, *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986), y por último, cuando un legislador se ve afectado directamente en su carácter personal por acciones gubernamentales, éste puede impugnar la constitucionalidad de una ley o actuación gubernamental. *Noriega v. Gobernador*, 122 D.P.R. 650 (1988).

Recientemente tuvimos la oportunidad de pautar la norma sobre la legitimación activa de los legisladores. En *Hernández Torres v. Gobernador*, supra, varios legisladores del Partido Nuevo Progresista, en su calidad de representantes a la Cámara y en defensa de un interés público, impugnaron la constitucionalidad de la Resolución Conjunta de Presupuesto de Mejoras Capitales y Gastos de Funcionamiento del Estado Libre Asociado de Puerto Rico. Al resolver que los legisladores no tenían legitimación activa para la impugnación de dicha ley, señalamos los criterios que deberán utilizar los tribunales cuando se impugne la legitimación activa de un legislador.

## II

En el caso de marras la parte apelada sostiene que sus prerrogativas legislativas se están viendo afectadas por "tener que legislar para la consideración y asignación de recursos a un departamento gubernamental creado mediante la aprobación de una ley inconstitucional". Apéndice I a la moción en auxilio de jurisdicción, pág. 2. Veamos.

■ Salvo las instancias ya mencionadas en las que hemos reconocido la legitimación activa de los legisladores, la norma prevaleciente en esta jurisdicción es que éstos tienen que demostrar que cumplen con todos los requisitos

jurisprudenciales exigidos a los particulares para ostentar la legitimación activa. En primer lugar, deberán demostrar que han sufrido un daño claro e inmediato a sus prerrogativas legislativas. Claro, no se trata de unas prerrogativas abstractas y que en nada tengan que ver con el ejercicio de sus funciones legislativas. Más bien, las prerrogativas legislativas son la garantía que tiene todo legislador a ejercitar plenamente su derecho constitucional a legislar comprendido en el Art. III, Sec. 1 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. *Hernández Agosto v. Romero Barceló*, supra; *Silva v. Hernández Agosto*, supra. Los tribunales deberán quedar convencidos de que no se trata de un traslado del debate legislativo al foro judicial y sí de una verdadera lesión a sus prerrogativas legislativas.

Además, tendrán que probar que existe una conexión entre el daño sufrido y la acción que pretenden ejercitar. Sus alegaciones no pueden estar basadas en que acuden al tribunal representando a sus constituyentes en vindicación de un interés general. *Hernández Torres v. Gobernador*, supra; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 151; Nota, *Equitable Discretion to Dismiss Congressional Plaintiff Suits: A Reassessment*, 40 Case W. Res. L. Rev. 1075 (1989–1990).

A través de todo el desarrollo doctrinal se entiende que los legisladores lo que realmente pretenden, al reclamar legitimación activa a base de un perjuicio general, es que los tribunales revoquen una decisión aprobada mayoritariamente en un proceso democrático en que no ha habido menoscabo alguno de sus prerrogativas legislativas. Por entender que este reclamo es esencialmente una excusa de los legisladores para trasladar el debate legislativo de la arena política al foro judicial, se rechaza en todas las jurisdicciones que los legisladores tengan acción legitimada para demandar en representación del interés público para impugnar estatutos aprobados por la Asamblea Legislativa. *Hernández Torres v. Gobernador*, supra, págs. 841–842.

■ Ahora bien, en muchas ocasiones los legisladores pretenden tener legitimación activa sosteniendo que sus prerrogativas se están viendo afectadas porque no se les permite fiscalizar adecuadamente la obra legislativa. Olvidan que la función fiscalizadora sólo implica los mecanismos razonables y necesarios que hagan viables su participación plena en todas las etapas críticas del proceso legislativo. En el pasado hemos reconocido que la minoría tiene la obligación especial de "descargar su responsabilidad fiscalizadora" sin que se convierta en su obstáculo para el proceso legislativo. *Silva v. Hernández Agosto*, supra, pág. 70. Es por esto que una mera alegación de que no se le permite fiscalizar no tiene el efecto automático de otorgarle legitimación activa para presentar una acción ante los tribunales. El legislador, antes de acudir al tribunal, deberá agotar todos los remedios que tenga a su disposición para lograr que se le permita y reconozca su derecho a fiscalizar.

A la luz de·los anteriores pronunciamientos, forzoso es concluir que la Representante Hernández Torres está impedida de validar su legitimación activa con una mera alegación de que sus prerrogativas legislativas se ven afectadas al tener que legislar para la consideración de fondos para una ley inconstitucional.

■ En nuestro sistema constitucional toda ley está sujeta a ser interpretada y ser declarada inconstitucional. El sujeto activo en la impugnación de la ley no puede valerse de una mera alegación a los efectos de que la ley es inconstitucional. Su legitimación activa debe estar sustentada a través de todas las etapas procesales del pleito a los efectos de que ha sufrido un daño claro, palpable y no especulativo y cumple con todos los otros requisitos necesarios para el reconocimiento de su legitimación activa:

En vista de que éstos no son meros requisitos de una etapa preliminar del proceso sino que son parte esencial del caso de la

parte demandante, cada elemento debe sostenerse de la misma manera que se sostiene cualquier otro asunto en que el peso de la prueba recaiga sobre la parte demandante, es decir, de la manera y con el grado de prueba requeridos en las etapas subsiguientes del litigio. *Lujan v. Defenders of Wildlife*, supra, pág. 4497.

En la etapa de sentencia sumaria la parte que pretenda el reconocimiento de su legitimación activa deberá, mediante "sus alegaciones ... [deposiciones], contestaciones a interrogatorios, y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostrar que existen hechos específicos en los cuales no existe controversia real y que como cuestión de derecho se cumplen con todos los requisitos antedichos en esta opinión que le hacen acreedor del reconocimiento de su legitimación activa. Véase la Regla 36.3 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III) y, a modo ilustrativo, *Lujan v. Defenders of Wildlife*, supra, pág. 4497.

Por otro lado, si se encuentran en la etapa final del juicio, el sujeto activo deberá presentar evidencia que demuestre que ha sufrido un daño claro y palpable, y que no descansa en una mera alegación de que la ley impugnada es inconstitucional. A modo ilustrativo, véase *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 esc. 31 (1979); *Lujan v. Defenders of Wildlife*, supra, pág. 4497.

En el caso del legislador se hace más patente este axioma porque su condición de legislador lo coloca más de cerca con la aprobación de muchas leyes. Si hoy permitiéramos que los legisladores se apoyaran en que poseen legitimación activa para impugnar una ley porque ellos entienden que ésta es inconstitucional, entonces nuestro acervo legislativo correría el riesgo de quedar paralizado porque, como dijimos, todas las leyes están sujetas a una declaración de inconstitucionalidad. No podemos refrendar esta tesis. Entonces, nos corresponde examinar si la Repre-

sentante Hernández Torres ha demostrado que sus prerrogativas legislativas han sido lesionadas. Veamos.

No surge de sus alegaciones que a la Representante se le esté causando un daño claro e inmediato a sus prerrogativas legislativas. En este caso, la Representante no está privada de ejercer su derecho a votar en contra de una legislación que ella entienda que no es beneficiosa para el Pueblo de Puerto Rico, ni a discutir y convencer a sus opositores de los defectos de la legislación. Ahora bien, si su voto no es suficiente y es fallido su intento de convencer a sus compañeros en el hemiciclo, entonces no puede pretender, mediante la presentación de una demanda, tener una segunda oportunidad en el foro judicial.[6] *Hernández Torres v. Gobernador*, supra. Véase, a modo ilustrativo, *Barnes v. Kline*, 759 F.2d 21, 28 (Cir. D.C.1984).

▮ Nuestro sistema constitucional se apoya en unas bases firmes de separación de poderes. La dinámica legislativa al aprobar una ley no puede estar supeditada a un traslado caprichoso de un legislador o a una intromisión indebida de nuestra parte, porque esto traería como consecuencia el trastocar nuestro lozano orden constitucional.[7]

Por las razones anteriormente expuestas, *resolvemos que la Representante Hernández Torres carece de legitimación activa para la impugnación de la ley creadora del D.A.C.P., por lo que el Tribunal Superior, Sala de San Juan, estaba impedido de emitir fallo alguno sobre la constitucionalidad de la ley. Se revoca la sentencia recurrida.*

Los Jueces Asociados Señores Negrón García y Rebollo

---

[6] Véanse: L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 150; *Kennedy v. Sampson*, 511 F.2d 430 (Cir. D.C.1974); A.M. Bickel, *The Passive Virtues*, 75 Harv. L. Rev. 40 (1961).

[7] Contrario a Puerto Rico, existen otras Constituciones en Europa que permiten que, luego de aprobada una ley, los legisladores puedan impugnar su validez ante el Tribunal Constitucional. Véase Art. 162(1) de la Constitución Española de 1978.

López emitieron sendas opiniones disidentes. El Juez Asociado Señor Fuster Berlingeri no intervino.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

"Por eso, la justicia es representada con una balanza en la mano, sopesando, y no resolviendo ecuaciones en una pizarra." Aurelio Fernández Anadón, citado por J.B. Vallet de Goytisolo, *Estudios sobre fuentes del Derecho y método jurídico*, Madrid, Ed. Montecorvo, 1982, pág. 747. Nada ganamos si en apariencia respetamos la Constitución, pero en realidad la destruimos.

I

Al decir mayoritario, "nuestro lozano [mucho verdor y frondosidad en las plantas](1) orden constitucional" (opinión mayoritaria, pág. 604), dejó de crecer hace algún tiempo, con la decisión restrictiva e injusta de *Hernández Torres v. Gobernador*, 129 D.P.R. 678 (1992), que negó a los legisladores de las minorías legitimación activa (*standing*), para cuestionar las actuaciones del Poder Ejecutivo, y la validez de los desembolsos de fondos públicos vía legislación y permitió como "arte de magia documental [que subsistiera] un presupuesto, en verdad deficitario, balanceado artificialmente." Íd.

De esta manera la mayoría evade enfrentarse a la realidad de que es inconstitucional usar fondos públicos para fomentar la inscripción y participación en elecciones municipales, estatales y federales en Estados Unidos, de puer-

---

(1) *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 843.

torriqueños (y sus descendientes) que se trasladaron a vivir allá y no residen en nuestra isla.

Hoy, al igual que ayer, con esta decisión judicial "[c]ontinuará en Nueva York y otros estados la campaña ilegal de inscripción y el derroche de cientos de miles de dólares de fondos públicos en contravención al Art. VI, Secs. 9 y 10 de nuestra Constitución, L.P.R.A., Tomo 1. Lo más serio de esta situación es que dicha erogación es a costa del sacrificio de otros valores humanos y necesidades comunitarias aquí en Puerto Rico. Ello, en momentos en que existe una grave crisis presupuestaria que ha exigido la eliminación y disminución de varios programas esenciales de servicio público (salud, policía, vivienda y educación, entre otros)". *Hernández Torres v. Hernández Colón et al.*, 127 D.P.R. 448 (1990), voto disidente.

## II

Una vez más denunciamos lo absurdo del *ratio decidendi* mayoritario que se nutre de un razonamiento circular vicioso. Se han autoimpuesto una camisa de fuerza que, a priori, no les permite adentrarse, siquiera un poco, en los méritos de la controversia y así poder constatar que efectivamente la Representante Honorable Hernández Torres satisface todos los requisitos de legitimación activa, a saber, sufrió un daño claro, real, inmediato y preciso; su causa de acción surge bajo el palio de la Constitución y de una ley, y existe una conexión entre el daño y dicha causa de acción.

Claramente, la controversia ante nos, lejos de presentarse como simplemente un asunto de interés general que esquiva los criterios clásicos de legitimación activa, cae perfectamente dentro de la zona de intereses protegidos de los miembros minoritarios de la Asamblea Legislativa. Naturalmente, la acción de la mayoría legislativa no puede afectar su legitimación.

La mayoría, básicamente, descansa en la premisa de que la labor de fiscalización de las minorías termina con la sola participación en el debate y proceso legislativo (opinión mayoritaria, pág. 602) esto es, con votar a favor o en contra de una ley. En su apoyo invocan y citan el enfoque doctrinario prevaleciente en lo federal. Es un grave error. Olvidan que, "[e]n contraste con la Constitución federal, la nuestra reconoció y garantizó expresamente, como medio de fiscalización, a las minorías legislativas. '[E]s básico para la *salud democrática* que las minorías tengan una representación que *aun bajo las circunstancias más desfavorables*, les permita cumplir adecuadamente su función de fiscalizar y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que puedan resultar en detrimento de la democracia'. 4 Diario de Sesiones de la Convención Constituyente 2590 (1952)". (Énfasis en el original.) *Hernández Torres v. Gobernador*, supra, págs. 680–681, voto preliminar disidente.

Esa interpretación anula la facultad constitucional fiscalizadora de las minorías. Si a la postre la mayoría tiene carta blanca para legislar sin tomar en cuenta los parámetros constitucionales, ¿de qué vale que la minoría participe responsable y plenamente "en todas las etapas críticas del proceso legislativo"? Opinión mayoritaria, pág. 602. ¿No estamos haciendo del sistema constitucional de frenos y contrapesos simplemente una anécdota?

En el ámbito técnico-procesal, en el párrafo noveno de la demanda, la Honorable Hernández Torres alegó que "las prerrogativas como legisladora de la peticionaria, las cuales están debidamente protegidas por nuestra Constitución, se están afectando directamente al *tener que legislar para la consideración y asignación de recursos a un departamento gubernamental creado mediante la aprobación de una ley inconstitucional*". (Énfasis suplido.) Apéndice I a la Moción en auxilio de jurisdicción, pág. 2.

Ciertamente, "[n]o concebimos cómo en un gobierno de

leyes, no hombres, un legislador venga obligado a aceptar dócil y pasivamente la inconstitucionalidad o ilegalidad de un acto ejecutivo que anula una legislación vigente —y sus votos— por el simple hecho de ostentar esa condición. En materia de justiciabilidad, no debemos confundir 'legitimidad' con 'cuestión política' ". *Hernández Torres v. Gobernador*, supra, pág. 854. Máxime cuando la minoría está investida constitucionalmente con el deber de fiscalización —*Fuster v. Busó*, 102 D.P.R. 327, 342 (1974)— y que en Puerto Rico están prohibidos los pleitos de contribuyentes. La única premisa que cabe, pues, es que los legisladores, como delegados de los ciudadanos legítimamente pueden acudir a los tribunales en representación y para vindicar sus prerrogativas y el interés público.

## III

Es lamentable que la mayoría haya optado por adjudicar con abstracción de los verdaderos hechos, claudicando ante los otros poderes públicos sus facultades judiciales.

[Los hechos] SON DRAMÁTICOS Y REVELADORES. Durante el año fiscal 1989–1990 el presupuesto de este Departamento fue de $2,186,747. Para el año fiscal 1990–1991 se solicitaron a la Asamblea Legislativa seis millones, ciento ochenta y un mil, seiscientos sesenta y dos dólares ($6,181,662). Parte de los fondos desembolsados se usaron por la *Oficina de Prensa y Relaciones Públicas* de dicho Departamento para pagar campañas publicitarias a través de la radio, prensa y televisión en las actividades bajo el *Programa de Orientación y Organización Pública*. ¿QUÉ ES ESTÉ PROGRAMA?

Según lo caracterizó la propia codemandada, Hon. Nydia Velázquez, Secretaria del Departamento, se trata de un *"instrumento de acción política"*. Vistas Públicas de la Comisión de Hacienda de la Cámara de Representantes de 18 de mayo de 1990, pág. 2. En esa ocasión ella también aceptó que el programa "ha estado dando asistencia *directa* a los grupos puertorriqueños organizados para participar en las elecciones municipales de distintos condados *en el Estado de New Jersey*". Íd., pág 3. Además, declaró, que "[u]n promedio de treinta y cinco

hispanos y puertorriqueños, corrieron sus candidaturas para distintos cargos en los condados de Paterson, Newark y Trenton. Íd. De estos treinta y cinco (35) candidatos, treinta (30) eran puertorriqueños". Íd., págs. 2 y 3. Finalmente admitió, que en el *futuro* —próximo año fiscal— el programa continuará con esa acción política "en aquellas ciudades con alta concentración de puertorriqueños". Íd., pág. 3.

No es necesaria mucha elucidación para entender que, despojado este Departamento de su liviano ropaje jurídico, la realidad es que estamos ante un programa gubernamental en el área electoral de múltiples "estrategias". Informe al Consejo Asesor del Gobernador sometido por la Secretaría del Departamento de junio de 1990, pág. 7.

En ese mismo informe, la Hon. Secretaria Velázquez reconoció que el *uso de fondos públicos del Estado Libre Asociado* ha "*permitido*" que varios puertorriqueños *hayan sido electos* para representar a la comunidad en escaños de servicio público . ... se ha logrado *representación* en Connecticut, y en New York *logramos mantener la representación del Distrito Congresional Núm. 18.*[Hon. José C. Serrano]". Informe, *supra*. (Énfasis en el original suprimido y énfasis suplido.) *Hernández Torres v. Hernández Colón et al.*, 127 D.P.R. 974, 986–987 (1991), opinión disidente.[2]

El uso indebido de fondos públicos ha continuado desenfrenadamente. Para los años fiscales 1991–1992 y 1992–1993, se asignaron a dicho Departamento, respectivamente, $5,861,895 y $6,261,895. Una parte sustancial continúa usándose para fines y procesos políticos ilegales. El resultado directo e inventario neto de la norma restrictiva mayoritaria sobre legitimación activa es que los ciudadanos tienen que esperar a las elecciones cada cuatro (4) años para enjuiciar en las urnas los excesos constitucionales de los poderes legislativos y ejecutivo. Jamás esa fue la intención de la Asamblea Constituyente.

Mientras tanto, repetimos, el desembolso ilegal de fondos públicos continúa irremediablemente. Es injusto que

---

[2] Procedía la sustitución, como codemandada, de la Sra. Nydia I. Velázquez. Tomamos conocimiento judicial de que renunció recientemente de su cargo de Directora del Departamento para *oficialmente* dedicarse a las lides políticas y pugnar por un escaño congresional.

se haya dejado a la ciudadanía en semejante estado de indefensión: la Constitución sigue opacada por un eclipse permanente de origen judicial.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

El pasado 31 de enero de 1992, al disentir de la opinión que emitiera una mayoría de los integrantes del Tribunal en *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992)(¹) —caso en que este Tribunal mayoritariamente determinó que la demandante Hernández Torres no tenía "capacidad jurídica" (*standing*) para cuestionar la constitucionalidad de la resolución conjunta de la Asamblea Legislativa relativa al presupuesto general del País— expresamos, en lo pertinente, que:

El campo de las leyes —distinto a otras disciplinas como las matemáticas, la física, la química, etc.— no es uno preciso y exacto. En relación con cualquier controversia legal existen, como regla general, dos "caras de la moneda". Como consecuencia de ello, *cualquier* profesional del derecho puede desarrollar, y fundamentar, un razonamiento legal en apoyo de cualquiera de las dos posiciones en controversia en un caso en particular de tal forma que cualquiera de dichas posiciones, *aun cuando realmente no lo sea*, parezca lógica, razonable y correcta..

Esa particularidad, que es tan "distintiva" del Derecho, es la que precisamente le permite a esta disciplina evolucionar y mejorarse continuamente y, por qué no decirlo, a los abogados ganarse la vida ya que si sólo hubiera una "solución" a un problema legal, no habría ninguna necesidad para la existencia de la litigación contenciosa. Por otro lado, esa misma particularidad es la que causa que, *en ocasiones*, la actividad y labor del abogado resulte incomprensible para la ciudadanía en general y que, hasta cierto punto, es la causa para la insatisfacción con, y descrédito de, la profesión legal ante los ojos de esa misma

---

(¹) 92 J.T.S. 16.

ciudadanía. En ocasiones, resulta difícil entender cómo un profesional del derecho, en defensa de una posición en particular, puede sostener, y argumentar, con vehemencia una posición que obviamente es errónea en derecho y moralmente inaceptable.

Esa situación, esto es, la existencia de "dos caras de la moneda" en toda controversia legal, es la que precisamente hace tan complicada y difícil la labor del juez. Su ministerio no puede consistir en meramente limitarse a escoger, *en forma acomodaticia*, una de las posibles soluciones y fundamentar la misma citando, como obediente autómata, decisiones y escritos en apoyo de la posición seleccionada; decisiones y escritos que aun cuando puedan parecer aplicables, por tratar del mismo tema, realmente no lo son pues han sido emitidas por jueces de otras jurisdicciones a la luz de las circunstancias, específicas y particulares, que imperan en dichas jurisdicciones.

*La labor del juez requiere algo más*. Este tiene que estar en disposición, en primer lugar, de actuar únicamente conforme los dictados de su conciencia, esto es, libre de toda atadura o influencia ajenas a su función y, en adición, libre de todo prejuicio o discrimen de clase alguna. En otras palabras, la objetividad e imparcialidad son requisitos indispensables del *buen* juez. Ausentes estas cualidades, la decisión que se emita por éste, por más fundamentada que luzca, será siempre una insatisfactoria.

Por otro lado, no puede enfatizarse lo suficiente el hecho de que ante posiciones conflictivas y, en ocasiones, igualmente fundamentadas, el "norte" que debe guiar el intelecto del juez no puede ser otro que el bien común. Ese es el factor determinante en, o fin último de, toda decisión judicial. Ello así por cuanto el propósito que inspira el establecimiento de las leyes y de todo sistema de derecho es precisamente ese: el bienestar general de la ciudadanía.

Ahí la razón por la cual la interrogante a ser contestada por el juez no se puede limitar a decidir cual es la posición que encuentra más apoyo en la jurisprudencia y los comentaristas. Esa labor, aun cuando importante, la puede realizar una computadora primitiva o, inclusive, un estudiante de primer año de Derecho. El término "jurídicamente procedente" implica, y conlleva, algo más que unas numerosas citas legales. Dicho término necesariamente significa que la solución a ser decretada por el juez no sólo esté dentro de los parámetros establecidos por el ordenamiento jurídico sino que la referida solución debe ser en beneficio general de la ciudadanía.

Es debido a ello que si en la consecución de esa solución justa

y beneficiosa, esto es, "jurídicamente procedente", el juez no encuentra precedente aplicable que apoye la misma, entonces ese juez tiene que estar presto y decidido a "abrir brecha" y establecer, conforme las guías generales del ordenamiento, *nueva* jurisprudencia. No debe olvidarse, después de todo, que en el "comienzo" no existían precedentes. Pero aún en el caso de que existan precedentes en contrario, si éstos no satisfacen su sentido de justicia, el juez no puede permitir que los mismos le impidan decretar la solución correcta que la situación, el momento, y el bienestar de la ciudadanía, requieren y exigen que él determine. *Esa, repetimos, es precisamente la razón por la cual el que lleva con orgullo la toga es un ser pensante, sensible e inteligente, y no una computadora o un autómata.*

La decisión que emite una mayoría de los integrantes del Tribunal en el presente caso ciertamente *no* es ejemplo de lo anteriormente expresado. *La misma —en unión a un sinnúmero de decisiones emitidas en los pasados seis (6) años— es una que posiblemente tendrá el efecto de destruir la reputación y credibilidad que en tiempos pasados tuvo este Tribunal.*

La Opinión mayoritaria, pág. 834, al resolver que los legisladores demandantes "carecen de legitimación activa para iniciar la presente acción en representación del interés público y que, por lo tanto, ni este Foro ni el tribunal de instancia tienen jurisdicción para adjudicar la controversia referente a la constitucionalidad del presupuesto general del año fiscal en curso" *no sólo le pone punto final a la presente controversia sino que, desgraciadamente para este País, igualmente causa la desestimación inmediata de varios pleitos y recursos de gran interés público, actualmente pendientes ante los tribunales de instancia y este Foro, tales como*: la impugnación del nombramiento, como juez del Tribunal Superior, del Lcdo. Wilfredo Santos López; la impugnación del contrato que le fuera otorgado al Lcdo. Héctor Rivera Cruz en relación con la liquidación de la Corporación de Renovación Urbana y Vivienda; el pleito en que se impugna la constitucionalidad del Departamento de Asuntos de la Comunidad Puertorriqueña en los Estados Unidos; y cualquier otro pleito que se radique en el futuro en representación y vindicación del interés público y en beneficio de nuestro País. La "suerte está echada" en cuanto a este tipo de casos.

La decisión hoy emitida es una tan errónea, dañina, y jurídicamente improcedente que constituye, a nuestro juicio, índice de un tribunal confundido y que confunde al País en general, y a la profesión legal en particular, mediante la emisión de decisiones contradictorias, inconsistentes y totalmente carentes de una filosofía judicial definida. *La reputación y credibilidad de este Tribunal tiene que necesariamente afectarse mientras se continúe* —apoyándose en tecnicismos legales y so color de

"prudencia judicial"— *eludiendo y rehusando cumplir con la función principal de este Tribunal, esto es, la de ilustrar al País y de pautar el derecho respecto a las cuestiones fundamentales que afectan el bienestar general, y destino, del mismo.* Parafraseando a Séneca, ninguna brisa le puede ser favorable a una institución que no sabe hacia donde se dirige. (Escolio omitido y énfasis en el original.) *Hernández Torres v. Gobernador*, ante, págs. 873–877.

No obstante haber tenido que, curiosamente, esperar el transcurso de un término aproximado de ocho (8) meses, *se ha cumplido nuestra predicción o vaticinio respecto a la desestimación del pleito relativo al Departamento de Asuntos a la Comunidad Puertorriqueña en los Estados Unidos.* No hay duda de que, paulatinamente, le seguirán las desestimaciones de los otros pleitos de importancia a los que hiciéramos referencia el pasado 31 de enero de 1992.

*Actuaciones como éstas son las que desafortunadamente causan que la ciudadanía no tenga confianza en nuestro sistema local de justicia. Mientras así se siga actuando, habrá que continuar aceptando ese doloroso veredicto, o dictamen, de nuestros conciudadanos.*